Kevin ARMSTRONG and Kraig Armstrong, minors, by Roosevelt Savage and Rochelle Savage, their parents and next friends, Mary Lou Hicks and Presten Hicks, minors, by Paul L. Hicks and Rose B. Hicks, their parents and next friends, Jean Robinson, by Alonzo Robinson and Theresa Robinson, their parents and next friends, and Andrew Smith, Grantley H. Smith, and Kermit Smith, minors, by Kenneth L. Smith and Phyllis G. Smith, their parents and next friends, Plaintiffs,

v.

Donald J. O'CONNELL, Thomas Brennan, Anthony S. Busalacchi, Margaret Dinges, Gerald P. Farley, Stephen Jesmok, Jr., Marian McEvilly, Maurice J. McSweeney, Edward S. Michalski, Clara A. New, Evelyn T. Pfeiffer, Lorraine M. Radtke, Lois Riley, Doris Stacy, and Leon W. Todd, Jr., Members of the Board of School Directors of the City of Milwaukee, Lee R. McMurrin, Superintendent of Schools of the City of Milwaukee, and Thomas A. Linton, Secretary-Business Manager of the Board of School Directors of the City of Milwaukee, Defendants,

Milwaukee Teachers' Education Association, Undesignated Intervenor.

Civ. A. No. 65–C–173.

United States District Court,
E. D. Wisconsin.

June 1, 1978.

Lloyd A. Barbee, Milwaukee, Wis., for named plaintiffs.

Irvin B. Charne, Milwaukee, Wis., for the absent members of the plaintiff classes.

L. C. Hammond, Jr., Patrick W. Schmidt, and Ronald E. Klipsch, Milwaukee, Wis., for defendants.

Curry First, Milwaukee, Wis., for Milwaukee Teachers' Education Association, undesignated intervenor.

TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | INTRODUCTION | 820 |
| II. | THE APPLICABLE LAW | 822 |
| III. | THREE GENERAL MATTERS PERTAINING TO INTENT | 826 |
| | A. The Previous Direct Evidence of Discriminatory Intent | 826 |
| | B. The Absence of Any Significantly Integrative Actions | 827 |
| | C. The "Neighborhood" School Policy | 829 |
| IV. | FACULTY ASSIGNMENT | 830 |
| | A. The Statistics Reflecting Teacher Segregation. | 830 |
| | B. Teachers' Placement Preference, the Teacher Shortage, and the Collective Bargaining Agreement Seniority Provisions | 832 |
| | C. The Defendants' Responsibility for the Segregation of Teachers | 835 |
| | D. Other Relevant Findings | 836 |
| V. | INTACT BUSSING | 836 |
| | A. Definitions | 836 |
| | B. The Development of MPS Bussing Practices | 838 |
| | C. The Defendants' Response to Overcrowding in the Schools | 844 |
| | D. The Defendants' Recess Practices | 845 |
| VI. | STUDENT TRANSFERS | 852 |
| VII. | BOUNDARY CHANGES, SITE SELECTION, AND SCHOOL CONSTRUCTION | 857 |
| | A. An Overview of MPS Boundary Changes, Site Selection, and School Construction | 857 |
| | B. Specific Examples of Discrimination in MPS Boundary Changes, Site Selection, and School Construction | 861 |
| | C. Conclusion | 866 |
| VIII. | CONCLUSION | 866 |

DECISION AND ORDER (Including Findings of Fact and Conclusions of Law)

REYNOLDS, Chief Judge.

█ The Court hereby finds, for the reasons stated below, that the defendants discriminated against the plaintiffs with segregative intent, as further specified below, and in so doing violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

I. *Introduction*

On January 19, 1976, the Court concluded that Milwaukee public "school authorities engaged in practices with the intent and for the purpose of creating and maintaining a segregated school system, and that such practices had the effect of causing current conditions of [racial imbalance] in the Milwaukee public schools." *Amos v. Board of School Directors of the City of Milwaukee,* 408 F.Supp. 765, 818 (E.D.Wis.1976). This holding of liability was affirmed by the

court of appeals on July 23, 1976. See *Armstrong v. Brennan,* 539 F.2d 625 (7th Cir. 1976). On June 28, 1977, however, the Supreme Court vacated the judgment of the court of appeals and remanded the case for reconsideration in light of *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977). See *Brennan v. Armstrong,* 433 U.S. 672, 97 S.Ct. 2907, 53 L.Ed.2d 1044 (1977). The court of appeals subsequently remanded the case to this court for proceedings consistent with the Supreme Court's mandate. *Armstrong v. Brennan,* 566 F.2d 1175. (7th Cir. 1977).

After consulting with the parties, the Court decided that the first issue to be considered on remand was the question of segregative intent. The plaintiffs and the defendants were permitted to supplement the original record with respect to this issue, and, as a result, an evidentiary hearing consuming 27 days of the court's calendar was held. As a result of the supplemental hearing, the record on the issue of segregative intent more than doubled. Approximately 65 witnesses testified at that hearing and almost 1,000 new exhibits were admitted in evidence. These included a complete set of the verbatim minutes of the Milwaukee School Board and its committees for the last twenty-five years, consisting of more than 490 bound volumes. Some of this new evidence dealt with matters not considered at the original trial. Other evidence presented at the supplemental hearing refined, and explained in greater detail, matters covered by the Court's January 19, 1976, decision. Still other evidence contradicted some of the findings contained in the Court's original decision.

At the conclusion of the evidentiary hearing held pursuant to the remand, the Court requested the parties to submit proposed findings of fact and conclusions of law on the issue of the presence or absence of discriminatory intent in the defendants' actions, and the Court informed the parties that those specific findings would be adopted which are supported by the evidence even though the specific findings do not support the general findings and conclusions reached by the Court. Thus, both specific findings relating to the presence or absence of intent and the general conclusions as to intent to be drawn from those findings are presented. This procedure is pointed out because in the appeal from the original decision finding the defendants liable for discrimination against the plaintiffs, the Seventh Circuit noted that there existed "an unexplained hiatus between specific findings of fact and conclusory findings of segregative intent." *Armstrong v. Brennan,* 539 F.2d at 636. The Seventh Circuit was rightfully concerned with a seeming contradiction between this Court's earlier conclusion that the defendants generally followed their policy, known as the "neighborhood" school policy, and the Court's conclusion that the defendants acted with discriminatory intent.

However, the record in this court contains numerous contradictions in the evidence. These contradictions, which are reflected in the specific findings of fact below, are caused by the fact that the defendants did not act with malice or a deliberate policy of overt separation of the races from all contact with each other in the school system. In fact, over the 25 years covered by these findings, black teachers have taught white children in white schools and white teachers have taught black children in black schools; black children have attended white schools and white children have attended black schools; white students have been intact bussed separately and together with black students; after the open transfer policy was adopted, black students have been free to transfer to any school in the system; and a number of members of the board of directors of the Milwaukee Public Schools (hereinafter "MPS") and many citizens of the City of Milwaukee over the years have been staunch advocates of increased integration within the system.

Therefore, it is not an easily discernible picture of relentless discriminatory intent

822

that emerges from the evidence of the defendants' words and conduct over the years, and there are contradictions in the evidence. While this Court is convinced beyond any doubt that the evidence compels the finding that the defendants acted with discriminatory or segregative intent, this Court, at the risk of instigating further hiatuses, believes that its decision should also contain those specific findings of fact which indicate that the defendants were not always motivated by a discriminatory intent, and such findings are included within each specific area of findings below.

The findings and conclusions made in this decision are supplemental to those contained in the Court's original decision and generally are in harmony with those findings, but where they are not, it is specifically noted otherwise. In case of a conflict, however, between the findings and conclusions of the first decision, and the findings and conclusions of this decision, the later ones are intended as controlling. The terms and symbols used in this decision bear the same definitions they were given in the original decision.

The format chosen by the Court for presentation of these findings of fact and conclusions of law is one in which the findings are numbered consecutively, with each number being preceded by the designation "F", while the conclusions of law are numbered consecutively in a separate sequence, with each number being preceded by the designation "L".

## II. *The Applicable Law*

■ **L–1.** The basic propositions of law applicable to this case are as follows. *Village of Arlington Heights* requires that before a violation of the equal protection clause of the constitution can be found, the action that is claimed to be violative must be shown to have been performed with an intent to discriminate. This discriminatory intent need not be the sole purpose nor the dominant purpose; it need merely be one of the purposes motivating the alleged discriminator. The issue of the presence or absence of discriminatory intent is one of fact,

but the proper method of proving such intent has not been established by the Supreme Court, although several probative considerations were listed in *Village of Arlington Heights*. It is therein indicated that a disproportionate impact of a lone official action accruing to the disadvantage of one race does not without more establish the requisite intent and does not amount to invidious discrimination. With this much of the law the parties are in agreement.

However, as to the specific application of these basic propositions of law, the parties have reached opposite conclusions. The plaintiffs' position is that intent, being an element of the prima facie case of many different common types of actions, i. e., criminal law and intentional torts, may be proved in court in a race discrimination case in the same manner that intent is proved in those other actions. Since direct evidence of a mental state, i. e., intent, is difficult to obtain, reasonable, circumstantial, or indirect evidence may be relied upon to prove the intent. The most common and perhaps the most reliable type of indirect evidence of intent is to examine the consequences of a party's actions to determine whether or not those actions were foreseeable by the party. If the consequences were foreseeable, a strong inference arises that the party intended to bring about those consequences unless other circumstances indicate that such was not the party's intent. Moreover, the inference that a party intends the natural and foreseeable consequences of his actions is so strong that it has been said to amount to a presumption of intent.

The defendants take exception to this analysis of the intent issue. Although they do not deny that the factor of foreseeability is a relevant consideration for determining the intent with which an action is performed, their argument is that foreseeability is of only the most minimal probative value and is, for all practical purposes, to be disregarded entirely. Intent, the defendants argue, may properly be proved only through consideration of the factors listed in *Village of Arlington Heights*. Thus, the defendants' position is that the plaintiffs

may not prove intent by establishing that increased or continued segregation was the natural and foreseeable result of the defendants' actions, and no presumption or inference of discriminatory intent arises from proof that the segregation was the foreseeable result.

■ L–2. There are, however, two flaws, flaws which the defendants seemingly believe trivial, in the defendants' position: (1) it is wrong; and (2) every court in the country that has considered the defendants' position has rejected it. The post-*Village of Arlington Heights* courts which have considered the question of the proper method by which discriminatory or segregative intent is to be proved have uniformly determined that a presumption that an actor intended to bring about the results of his actions arises when it is shown that those results were the natural and foreseeable consequences of the actions. See *Arthur v. Nyquist*, 573 F.2d 134 at 141–143 (2d Cir. 1978); *N. A. A. C. P. v. Lansing Board of Education*, 559 F.2d 1042, 1046–48 (6th Cir. 1977), cert. denied 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977); *United States v. Texas Education Agency*, 564 F.2d 162, 167–69 (5th Cir. 1977); *United States v. School District of Omaha*, 565 F.2d 127, 128 (8th Cir. 1977), cert. denied 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); *Reed v. Rhodes*, No. C73- 1300 (N.D.Ohio 1978) (slip op. at 10); *Berry v. School District of Benton Harbor*, 442 F.Supp. 1280, 1290–94 (W.D.Mich.1977); and *Penick v. Columbus Board of Education*, 429 F.Supp. 229, 252 (S.D.Ohio 1977).

■ L–3. This view of the *Village of Arlington Heights* requirement of intent as permitting proof through examination of objective circumstances rather than subjective state of mind has been adopted by at least one judge of the Seventh Circuit Court of Appeals in dicta. His language bears quotation at length:

> "It is clear, therefore, that discriminatory purpose for constitutional analysis is to be gleaned not from individual officials but from the relevant governmental institutions. As a subjective test would be impossible to apply in such circumstances, the courts are driven to adopt an objective criterion in determining whether the challenged state action is imbued with a segregative intent or purpose. Such a criterion must include an examination of the institutional policy that underlies the action. (By 'policy' we mean a deliberate course of action, selected among alternatives, that is deemed advantageous or expedient.) We agree with the Sixth Circuit when it said:

> > A presumption of segregative purpose arises when plaintiffs establish that the natural, probable, and foreseeable result of public officials' action or inaction was an increase or perpetuation of public school segregation. The presumption becomes proof unless defendants affirmatively established that their action or inaction was a consistent and resolute application of racially neutral policies. *NAACP v. Lansing Board of Education*, 559 F.2d 1042, 1046–47 (6th Cir. 1977), *quoting Oliver v. Michigan State Board of Education*, 508 F.2d 178, 182 (6th Cir. 1974).

> "Thus if plaintiffs establish either that the governmental action or inaction under scrutiny does not further the governmental policies or that the government ignored less segregative options which would have furthered its policies as effectively as the more segregative option it chose, *see Armstrong v. Brennan*, 539 F.2d 625, 636 (7th Cir. 1976), then a prima facie case of discriminatory intent or purpose has been made out. This inference is justifiable because governmental institutions must be presumed to have knowledge of the natural and foreseeable consequences of their action or [sic] inaction, and because there are rarely significant nonracial reasons for preferring a more rather than less segregative alternative." *United States v. Board of School Commissioners of the City of Indianapolis, Indiana*, 573 F.2d 400, at 413 (7th Cir. 1978) (Judge Swygert) (footnotes omitted).

Thus a presumption of discriminatory intent arises from a showing that increased or continued racial segregation was the foreseeable result of official action or inaction that did not further avowed governmental policies or that ignored less segregative options which were equally consistent with governmental policies.

The defendants argue that the decisions allowing discriminatory intent to be established through proof of foreseeability are incorrect. With this I do not agree. To show why this Court has determined to follow precedent in this case, the defendants' arguments will be addressed in turn.

First, the defendants maintain that allowing a prima facie case of discriminatory intent to be established through the concept of foreseeability of segregative impact eliminates the distinction between *de facto* segregation, for which no constitutional violation may be found, and *de jure* segregation which does amount to a constitutional violation. *De facto* segregation is that which is the adventitious result of individual decisions or governmental decisions made without any purpose or intent of causing segregation, while *de jure* segregation is that which is the intentional result of official action or inaction. The differentiating factor is intent to discriminate or to segregate. *Keyes v. School District No. 1,* 413 U.S. 189, 208, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). The defendants argue that allowing a presumption of intent to arise from mere proof of foreseeability means that a plaintiff need only introduce proof that a racial imbalance in a school system exists for a finding of a constitutional violation to be made, which eliminates the *de facto-de jure* distinction.

L-4. However, the *de facto-de jure* segregation distinction does remain where a plaintiff is allowed to prove intent through reliance upon the concept of foreseeability. More than a mere showing of a racial imbalance is necessary for the establishment of a prima facie case of discrimination; that imbalance must have been caused by official action or inaction undertaken with a purpose or intent to discriminate. Intent may be established through the use of the foreseeability concept, but a showing that an imbalance exists is not the same as a showing that the imbalance was foreseeable, which is what may be used to show intent. Establishment of the foreseeability of a segregative result of an official action or inaction is an added step beyond establishment that an imbalance exists, and the added step serves to preserve the distinction between *de facto* and *de jure* segregation. Moreover, under the view of Judge Swygert of the Seventh Circuit in *United States v. Board of School Commissioners of the City of Indianapolis,* supra, the official action or inaction from which the foreseeability of segregation is said to arise is action or inaction that does not serve avowed governmental policies or that overlooks less segregative options, and proof of such action or inaction is an additional step beyond a mere showing that a racial imbalance exists.

The defendants have further argued that reliance upon the concept of foreseeability of segregation as giving rise to a presumption of intent to discriminate would sound the death knell of the "neighborhood" school policy. The defendants argue that actions taken pursuant to the "neighborhood" school policy inevitably give rise to racial imbalance in the schools due to the prevailing pattern of segregation of blacks and whites in separate neighborhoods, and that racial imbalance is the foreseeable result of action and inaction by governmental officials.

L-5. However, the plaintiffs in this action do not contend that the "neighborhood" school policy itself amounts to invidious discrimination between blacks and whites. The "neighborhood" school policy has been upheld as a valid organizational principle for school systems, *N.A.A.C.P. v. Lansing Board of Education,* 559 F.2d at 1049, despite the foreseeable segregative effect of such a policy. The defendants remain free to follow that policy so long as the policy is applied in a consistent and neutral fashion and is not changed when the racial compositions of school districts change. But, as is shown in section III. C.

below, the defendants have failed to apply their purported "neighborhood" school policy in such a consistent and neutral fashion.

The third objection raised by the defendants is that reliance upon the concept of foreseeability quickly results in foreseeability being treated as the sole factor relevant to the issue of discriminatory intent in derogation of the factors listed by the Supreme Court in *Village of Arlington Heights* as being the controlling factors. Whereas the concept of foreseeability greatly facilitates a plaintiff's efforts to prove discriminatory intent, the Supreme Court intended, according to the defendants, that plaintiffs in school discrimination cases should have a heavy burden of proof to carry and should be required to undertake a detailed and painstaking analysis of each of every action of an alleged discriminator so as to minimize intrusion by the courts into the traditional autonomy of local school boards.

▆▆▆ L–6. Foreseeability of segregative effects is, of course, not the only factor to be considered in ascertaining discriminatory intent. The other factors listed in *Village of Arlington Heights*, as an inexhaustive list, are also relevant and, as demonstrated below, have been considered by the Court in finding the facts in this case.

L–7. But the concept of foreseeability has come to play an important role in the context of school discrimination cases due to the vastly different nature of those cases as distinguished from a case like *Village of Arlington Heights*. *Village of Arlington Heights* involved a single action taken by a well-defined public body with respect to a single, proposed, potentially integrative project. The action taken by the public body, which was a refusal to rezone a parcel of land so as to allow the construction of low and moderate income multiple family housing, made no changes in the existing zoning scheme and simply continued the long-standing status quo. The impact of the lone action, the exclusion of low-income blacks from the community, was foreseeable, but this isolated segregative impact of the single action had little probative value, and the context in which the decision was

made was more probative on the issue of intent.

The factual situation of the claimed discrimination in *Village of Arlington Heights* thus stands in sharp contrast to the factual situation of the present case, wherein hundreds, if not thousands, of decisions have been made by a public body with a changing membership and by an administrative bureaucracy with changing officials over a period of more than a quarter century, decisions which continually changed the status quo and had direct effects upon racial imbalances. The problem of proving intent in the present case is further complicated by the defendant officials' and school board members' ability, due to the vague nature of many of the policies raised in this case, such as the "neighborhood" school policy, to formulate a seemingly non-discriminatory plausible reason for almost every challenged action. Under these circumstances, to limit the available evidentiary tools to the *Village of Arlington Heights* factors alone would be to impose an impossible burden of proof in most school desegregation cases.

L–8. Thus, reliance upon the concept of foreseeability of segregative results is mandated not only by the logical relevance and probative value of that concept as to the issue of the defendants' institutional intent, but also by the necessity of allowing alleged victims of discrimination an opportunity to prove their claims. While one may wonder if the Supreme Court in fact is intending to terminate, *sub silentio*, this chapter of our nation's history involving the desegregation of "northern" schools by imposing an insurmountable burden of proof upon the plaintiffs in such cases, I have concluded that the Supreme Court has not done this and therefore the concept of foreseeability is still relevant to determining whether or not the actions of school officials were taken with discriminatory intent.

▆▆▆ L–9. Contrary to the defendants' assertions, the concept of foreseeability also does not do away with the need for a detailed and painstaking factual and legal analysis of the actions which the plaintiffs

claim to be discriminatory. Where an action is challenged, such analysis is still necessary to determine what policy was intended to be served by the action, whether or not the action did in fact serve that policy, and whether or not there were less segregative options to the chosen action that would have served the designated policy equally well. Such analysis is further required to apply the *Village of Arlington Heights* factors to the specific factual situation. Moreover, detailed analysis is also necessary when, as in most instances, the defendants have presented to the court justifications for the actions which they have taken. The findings of fact below embody the type of analysis advocated by the defendants.

L–10. From this discussion the conclusion follows that the court may properly consider as indicative of discriminatory purpose or intent the actions or inactions by the defendants which had the natural, probable, and foreseeable effect of segregating blacks from whites in the Milwaukee Public School system. That foreseeable effect gives rise to a presumption or inference of discriminatory purpose or intent upon a showing by the plaintiffs that the defendants' action or inaction did not further asserted governmental policies or that the government ignored less segregative options which would have furthered the asserted governmental policies equally as effectively as the chosen action or inaction. The presumption becomes proof unless the defendants show that their action or inaction was a consistent and resolute application of racially neutral policies.

L–11. As a final legal matter, the parties have also differed over whether or not a finding of intentional discrimination as to one part, activity, or function within the MPS system may inferentially support a finding of intentional discrimination in another part, activity, or function. The court believes that a finding of intentional discrimination in one part, activity, or function does infer that other actions were taken with a similar intent, if the area in which the original discrimination is found is a substantial and not isolated part, activity, or function of the school system. Allowing the inference of discriminatory intent to arise in one area after it has been proved in another area is similar to the Supreme Court's approval in *Keyes v. School District No. 1*, 413 U.S. at 198–205, 93 S.Ct. 2686, of the inference that one geographic area of a school district was subjected to state-imposed segregation where intentional segregation in another geographic area was proved. That intentional discrimination occurred within one range of the defendants' activities is logically relevant, though not conclusive, to a finding of discrimination as to another range of activities.

Additional conclusions of law are presented below in conjunction with the specific findings of fact.

### III. Three General Matters Pertaining to Intent

#### A. The Previous Direct Evidence of Discriminatory Intent

In the remand hearing on the issue of the presence or absence of discriminatory intent in the defendants' actions, the court has been presented, as indicated in greater detail in the specific findings of fact below, with a large quantity of indirect or circumstantial evidence of discriminatory intent, such as the inference of intent to discriminate that arises from a finding that segregation of the races was the natural and foreseeable result of the defendants' actions, as well as with direct evidence of discriminatory intent, such as the statements of various MPS administrators and board members. Such direct evidence in the form of statements from governmental officials is among the probative factors listed in *Village of Arlington Heights*.

F–1. A number of out-of-court statements from school board or administrative personnel were introduced at this new hearing, statements indicating a generally low regard for the customs and traditions of members of the Negro race as perceived by those officials. However, as to the issue of discriminatory intent, the most probative direct evidence of the intent with which the myriad decisions for the operation of the

MPS system were made over the years remains the testimony relied upon by the court in the original decision in this case. The finding that was made based upon that testimony is set forth below and specifically readopted herein:

F–2. "The question of intent, purpose, and motivation has not been a serious problem in this case because school authorities were so straight-forward, honest, and direct in their testimony at trial. The Superintendent of Education, Dr. Richard P. Gousha, and the Assistant Superintendent of Education, Dr. Dwight Teel, testified in essence that the Board of School Directors of the City of Milwaukee and its administration is, [sic] and has [sic] been since 1950, unalterably opposed to any form of forced integration and, from an educational point of view, does [sic] not believe in any substantial racial integration in the schools at this time. They further testified that neither the Board nor the Administration has ever in any significant way knowingly cooperated with any policy, program, or law, either federal or state, which had as its objective the integration of the races. They indicated that the school authorities in the past twenty years had not committed an act or adopted a practice that ever resulted in the significant integration of the schools. The superintendent stated that if the system was integrated, most of the whites would move out of the city and resegregation would follow. In taking this position, he argued that school officials were not motivated by a desire to discriminate against blacks but by an interest in a quality education for each child and a belief that this could not be accomplished in an integrated system." *Amos v. Board of Directors*, 408 F.Supp. at 819.

The direct evidence thus again supports the finding that the defendants did act with a purpose or intent to cause invidious racial discrimination.

B. *The Absence of Any Significantly Integrative Actions*

F–3. In the original decision in this case, the Court made the following finding:

"There have not been any affirmative actions taken by the Board that have resulted in further integration or substantial lessening of the percentage of black students in any of the system's schools, nor has the Administration made any such recommendations despite discussions and evaluations by both the Administration and the Board." *Amos v. Board of Directors*, 408 F.Supp. at 808.

The Court further noted that:

"[i]n Milwaukee, none of [the defendants'] decisions ever resulted in any significant or noticeable degree of desegregation in the school system, and practically all of them resulted in greater segregation." Id. at 820.

These original findings are specifically reapproved here as they relate to the issue of intent. The absence of any significantly integrative action provides circumstantial evidence that the defendants intended in fact to segregate blacks. To adopt yet one more verbatim passage from this court's earlier decision:

"It is hard to believe that out of all the decisions made by school authorities under varying conditions over a twenty-year period, mere chance resulted in there being almost no decision that resulted in the furthering of integration." Id. at 819.

F–4. In response to these findings, the defendants have produced at this hearing an "affirmative action index" in which a number of allegedly integrative actions by the defendants are presented. Those actions were stated as follows:

1. adoption of the open transfer policy to aid voluntary integration;

2. adoption of a minority recruitment program for Milwaukee Trade and Technical High School;

3. creation of Jackie Robinson Junior High School as an alternative junior high school with a racial balance requirement for the makeup of the student body;

4. adoption of a program to study schools which are approaching a 25% mi-

nority pupil population so as to prevent racial imbalance from occurring at these schools;

5. placement of a certificate of overload on Riverside High School to halt transfers into or out of the school so as to prevent further racial change;

6. establishment of a special committee on human rights;

7. approval of the teacher/pupil learning center at Jefferson School with racial balance requirements;

8. adoption of the statement on Education and Human Rights indicating that the Board is committed to promoting integration;

9. adoption of a policy on educational alternatives concerning high schools unlimited and options for learning, which programs formed the basis for the creation of specialty schools which draw students from the entire city.

In addition, the defendants have argued that adoption of a minority teacher recruitment program and a program for balancing the teaching staffs of schools and the adoption on March 14, 1978, of a plan for pursuing voluntary integration are additional examples of integrative action by the defendants. A closer examination of these "affirmative actions", however, reveals that the above-quoted reiteration of this court's earlier finding of fact remains valid.

F–5. None of these actions by the defendants had any significant integrative effect and all were consistent with the defendants' policy of insuring that white students were not compelled to attend school with large numbers of blacks. The adoption of the open transfer policy did have the effect of dispersing blacks to certain predominantly white schools, but as indicated in section VI below, the open transfer policy was primarily used by whites to escape schools that were black or that were becoming black and such usage of the transfer policy had the implicit endorsement of the defendants. The minority recruitment program for Milwaukee Trade and Technical High School was a program that sought only volunteers, and there is no

indication that the program achieved any degree of successful integration. Similarly, the creation of Jackie Robinson Junior High School, the creation of the Jefferson School Learning Center, and the adoption of the programs called "high schools unlimited" and "options for learning" to establish specialty schools were no more than voluntary programs that did not violate the defendants' desire to shield white students from having to attend black schools. Moreover, there is also no indication that these programs achieved any successful degree of integration. As to the adoption of the plan to stabilize schools approaching the 25% black level and the placement of a certificate of overload on Riverside High School, the defendants have argued that both transfers in and out of such schools were halted. However, Lorraine Radtke, a member of the Board of School Directors, testified that in reality only transfers of blacks into such schools were barred; whites remained free to transfer out, which again is consistent with the defendants' objective of not requiring white students to attend schools with large numbers of blacks. The creation of the special committee on human rights and the adoption of the statement indicating a commitment to promoting integration have not been shown to have had any integrative impact at all on the defendants' school system. The defendants' minority recruitment program did result in increasing the number of MPS black teachers, but the findings presented in section IV below indicate that the teachers were discriminatorily assigned to predominantly black schools and were not used for balancing the teaching staffs of schools.

Lastly, the defendants filed their March 14, 1978, plan for integration for the year 1978–79. The Court is not presently in a position to evaluate this plan as it was not the subject of analysis at the hearing.

F–6. The majority of these actions were taken only in relatively recent years and relate to a period of time later than that to which most of the evidence of discriminatory intent in this case relates.

F–7. Therefore, the Court finds that the defendants' purported affirmative actions do not establish that the defendants have not been motivated by an intent to discriminate.

C. *The "Neighborhood" School Policy*

In the decision of January 19, 1976, this Court stated:

"The Board has consistently and uniformly adhered to a 'neighborhood school policy' first developed in 1919 * * *. The policy has controlled the allocation of students among the schools in the system for attendance purposes, except as to students who have voluntarily transferred from their neighborhood schools pursuant to the Board's free transfer and open transfer policies * * * and except for certain special educational programs." *Amos v. Board of Directors*, 408 F.Supp. at 780.

This Court also stated:

"This central policy has been supported through the years by most Board members and has been of decisive importance in a host of decisions concerning how and where students were and will be educated, including decisions with respect to new school site selection and construction, school remodeling, school building additions, and action taken to meet the increased crowding in the schools during the 1950's and early 1960's." Id. at 781.

F–8. Evidence presented at the remand hearing has indicated that those findings by the court were in error, although the error was actually more one of emphasis than strict fact. The evidence at the remand hearing established that the "neighborhood" school policy was in fact a very vague and flexible general guideline that provided no more than a starting point for analysis in the defendants' decision-making process over the years. The "neighborhood" school policy as it has been interpreted and applied by the defendants did not mandate a single preordained solution to every problem that arose; rather, it permitted a wide range of solutions to the defendants' problems over the years and the defendants felt no compunction in departing from the hazy decisional guidelines provided by the "neighborhood" school policy.

F–9. As was stated in this court's earlier decision, "[t]he essence of [the 'neighborhood' school] policy has been the assignment of students to schools within reasonable geographic distances of the students' residences." *Amos v. Board of Directors*, 408 F.Supp. at 780. Yet, the evidence at the remand hearing indicates that this basic aspect of the policy did not provide any automatic decisional rules. The defendants' proposed districting for the planned Elm Junior High School, wherein white students living near to the planned school were to be assigned to a farther away school while blacks from significant distances away were to be assigned to Elm, see finding F–87 below, illustrates the flexibility with which the policy could be applied. The policy did not mean that a student attended a school closest to his home. It did not mean a definite maximum walking distance for a student. It did not mean that each school, whether elementary, junior or senior high, would have the same grade level organization. It did not mean that all students would be able to walk to school. It did not mean all schools would be the same size. It did not mean that elementary schools would feed into the closest junior or senior high school. It did not even have the same meaning for all of the school board members and administrators in the Milwaukee Public School System. It did not pre-ordain any decision with regard to school attendance, school siting, school building addition, schools to which students would be bussed, whether there should be a student transfer policy and, if so, what kind of policy should be permitted, or whether to use mixed or intact bussing. It had no relationship to teacher assignments.

F–10. Not only did defendants have great flexibility in administering their "neighborhood" school policy, but they also instituted programs deviating from the goal of having students walk to school. These deviations, each of which drew students from more than one district, included the

free and open transfer system, establishment of a city-wide specialty high school, establishment of a superior ability program, and grade reorganizations sending children to "nonneighborhood" schools. Moreover, when the core area schools became crowded, the defendants bussed students to "nonneighborhood" schools, rather than increasing class sizes or teaching students in shifts, as would have been consistent with a "neighborhood" school policy. Thus, the "neighborhood" school policy was never interpreted by defendants so as to interfere with their desired educational programs. It was only when the possible application of prior practices threatened to create a situation where white children would be assigned to attend schools also attended by large numbers of black students that the defendants determined that the "neighborhood" school policy dictated some other course of action, a course which fostered racial separation in the school system.

L–12. Throughout the history of this desegregation case, the defendants have time and again, with regard to nearly every specific official action challenged by the plaintiffs, wielded the "neighborhood" school policy as a shield of perceived talismanic strength in warding off liability for discrimination. Their claims are that their actions were simply neutral applications of that overriding policy and that their flexibility in applying the policy cannot be taken as evidence of discriminatory intent. However, the significance of that flexibility is not that by itself it shows discriminatory intent, but rather that the flexibility undermines the basis of the defendants' reliance upon that policy as providing a defense to the discriminatory actions charged against them. The existence of that flexibility shows that the defendants' discretion in individual actions, such as boundary changes, was not significantly circumscribed.

F–11. A neighborhood school policy did not mandate a segregated system in Milwaukee. The segregation of the system was mandated by the defendants who controlled the MPS system and are now seeking to take refuge for their unconstitutional conduct in that amorphous haven, the "neighborhood" school policy.

## IV.  Faculty Assignment

### A.  The Statistics Reflecting Teacher Segregation

F–12.  Prior to the Court's January 19, 1976, decision, most black teachers employed by MPS taught in schools with predominantly black student bodies. The disproportionate representation of blacks on the faculties of schools having a high percentage of black students is not a recent phenomenon, as the information set forth below indicates:

(a)  During the 1950–51 school year, the first school year for which statistical data concerning the racial distribution of teachers appears in the record, less than 6% of all MPS students were black, and nine of the system's 1,749 teachers were black. Eight of the black teachers were assigned to elementary schools, and all eight of them taught at the only two elementary schools in the system whose student populations were over 90% black. These two schools then accommodated more than half of the system's black students. The system's one other black teacher was assigned to the only junior high school in the system which had a majority black student population. This junior high school was attended by approximately 60% of the system's black junior high school pupils.

(b)  During the 1960–61 school year, black students constituted approximately 16% of all MPS pupils, and 193 (or approximately 6%) of the system's 2,871 teachers were black. Approximately 83% of these black teachers were assigned to schools whose student bodies were majority black, and about 64% of the black teachers taught in schools having student populations of more than 90% black. More than 82% of the system's black pupils were then assigned to majority black schools, and approximately 56% of MPS's black students attended schools which were over 90% black.

(c)  During the 1965–1966 school year, approximately 23% of the system's pupils

were black, and 480 (or approximately 13%) of the 3,724 MPS teachers were black. Of the black teachers, 82.9% taught in the schools whose student bodies were majority black, and 67.9% taught in schools which were more than 90% black. Milwaukee's majority black public schools were then attended by more than 84% of the system's black students, and approximately 64% of the system's black students attended schools which were over 90% black.

(d) During the 1972–73 school year, when almost one-third of the system's pupils were black, about 800, or almost 15% of the system's teachers were black. Of these black teachers, 79% were assigned to schools with majority black student enrollments. Moreover, 72.55% of the black secondary teachers and 80% of the black elementary teachers were assigned to schools which had pupil percentages exceeding 80% black. More than 80% of the system's black students then attended schools which were more than 50% black, and more than 75% of the black students attended schools which were over 80% black.

The defendants have opposed this finding on a number of grounds. First, they have questioned the accuracy of most of the statistics by arguing that the source of the statistics, exhibit 405, was the report of a biased expert operating in conjunction with organizations formed for the purpose of promoting integration in the public school system. The Court agrees that there is a possibility of unconscious bias in the statistics, but the possibility of such bias is not so great as to overcome the probative value of the statistics. The defendants have not shown any specific inaccuracies in the statistics or the method by which they were compiled, and the statistics are derived from basic data rather than the conclusions of the report.

Second, the defendants have argued that the statistics are misleading in that they reflect no information about how the black teachers covered in the statistics came to be assigned to the particular schools at which they were teaching at the time periods covered by the statistics. This argument also does not impeach the validity of the statistics, for regardless of how the teachers came to be assigned to the particular schools, the statistics still reveal a pattern of substantial racial separation of teachers. As such, the statistics offer probative evidence of discriminatory intent on the part of the defendants. *Washington v. Davis*, 426 U.S. 229, 253, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), (Stevens, J., concurring). The defendants' argument that the black teachers were segregated as the result of their own desires to teach near their homes is rejected in subpart B below.

Third, the defendants argue that the statistics do not show that black teachers have been barred from teaching in white schools. The defendants are correct. However, this lawsuit has never been premised upon a claim that the defendants engaged in such comprehensive discrimination that all blacks were kept apart from all whites. Rather, the issue is whether the defendants' actions or inactions have been discriminatory in that they have attempted to keep black teachers from teaching in substantial numbers anywhere but in predominantly black schools and that black teachers have been assigned to predominantly black schools in the belief that black teachers are more appropriately suited for teaching black students. Thus, the fact that there were some black teachers assigned to predominantly white schools does not undercut the statistical showing of racial imbalance on teaching staffs. Nevertheless, in the interests of compilation of a complete record, the Court also adopts the following finding of fact which the defendants believe shows that there was no intent to keep black teachers out of white schools.

F–13. In 1965, there were 6 blacks teaching in 0% black schools, 37 in .1–10% black schools, 24 in 11–30% black schools, and 15 in 31–50% black schools. In 1966, nonwhite teachers were assigned to 42 schools outside the central city. In 1967, the staffs of nearly 50% of the 155 schools included black teachers. In 1969–70, there were 31 black teachers in elementary schools with student bodies less than 10% nonwhite, and 11 in

those schools in the 10–50% black category. One or more black teachers were in 71 of the system's 127 elementary schools. During this year, there were 17 black teachers in secondary schools with student bodies less than 0–10% black and 4 in those schools in the 10–50% black category. One or more black teachers were in 29 of the system's 33 secondary schools. By 1970–71, there were 683 black teachers in the system, and 117 of the schools had integrated faculties with all secondary schools having integrated faculties, except for one junior high school.

The trend of the defendants' system in recent years has been toward increasing faculty integration, but such a trend is more relevant to the matter of the present effects of the defendants' past discrimination than to the matter of the defendants' earlier discriminatory intent.

F–14. Despite the trend of the statistics shown in finding F–13 above, a finding of discriminatory intent on the part of the defendants during the period covered by this lawsuit is supported by the figures on the racial compositions of teaching staffs of identifiably black schools.

### B. Teacher's Placement Preference, the Teacher Shortage, and the Collective Bargaining Agreement Seniority Provisions

In explaining their teacher hiring and assignment personnel policies, the defendants have strenuously and repeatedly relied upon three concepts to negate any implication of segregative intent that might arise from the severe racial imbalances that existed during the period involved in this case on the staffs of Milwaukee public schools. First, the defendants maintain that black teachers in both initial and subsequent assignments valued above all else receiving an assignment to teach at a school near their homes, which homes tended to be primarily in the core area of the city either through prevailing patterns of housing discrimination or through desires to be with "their own people." Second, the defendants maintain that due to the critical shortage of teachers during much of the relevant period, the defendants were compelled to assent to the black teachers' requests to be assigned near home, even though such assignments dashed the defendants' purported wishes to achieve a greater racial balance of teachers throughout the system. Third, the defendants claim they were further barred from correcting the racial imbalances on teaching staffs by the strict seniority transfer provisions of the collective bargaining agreement with the Milwaukee Teachers' Education Association ("MTEA").

These purported defenses are rejected by the court. The evidence does not support these theories as the following findings of fact show.

F–15. The segregative effect of the defendants' policies of assigning black teachers primarily to identifiably black schools was clearly foreseeable and gives rise to an inference that the assignments were made with intent to discriminate. The defendants were well aware that blacks lived primarily in the central area of the city and that assigning blacks to schools near the black residences would result in a separation of the races. Discriminatory intent on the part of the defendants is established unless they can show that the assignment of black teachers primarily to schools in the central city area was the result of consistent and resolute application of racially neutral policies.

F–16. The testimony does not establish that black teachers generally preferred to be assigned close to their places of residence. The defendants have relied upon the testimony of Clara New, Lauri Wynn, Roberta Wilkerson, Delores Greene, Susan Ellis, LeRoy Freeman, John Jackson, and Connye Robinson, all black teachers. Only New testified that she originally requested an assignment close to her home. Wynn's testimony was that the most important factor for her in receiving an assignment was the professional interest of the assignment and that location of the assignment was only a secondary consideration. Wilkerson did not testify that she ever requested an assignment close to her home, and her testimony that she was treated "beautifully" is

irrelevant to the issue of whether or not black teachers did in fact request assignments close to home. Greene did not testify that she initially requested assignment close to home, although she did state that she later requested a re-assignment closer to home. She was told by school administration personnel that she would probably find housing in the core area and that she would be assigned after she found housing. Ellis did not testify on the matter of where black teachers were assigned. Freeman and Robinson did not testify that they ever requested assignment close to their residences, and in fact, they received their assignments before they had even moved to Milwaukee and found residences. Likewise, Jackson did not testify that he preferred to be assigned close to his home.

Peter Brem, a former Executive Director of Teacher Personnel for the system, did testify that one of the first questions asked by all applicants for teacher positions was to inquire where they would be teaching if they accepted a position in Milwaukee. This testimony, however, does not in any way establish that new teachers, particularly blacks, were primarily concerned with receiving assignments close to their residences.

F–17. No black teacher testified that he was given a choice in initial teaching assignment of teaching in a predominantly white school or a predominantly black school nearer to his home.

F–18. Despite the teacher shortage during the 1960's, no teacher, black or white, testified that he would have refused employment with the Milwaukee system if he would have been refused a requested assignment near his home.

F–19. The defendants did not consistently apply a policy of assigning teachers close to their homes. The testimony of Donald Feilbach, a former MTEA president, and James Colter, Executive Director of the MTEA, shows that white teachers were frequently given initial assignments substantial distances away from their homes. Moreover, a study prepared under the auspices of the Milwaukee Urban League found that many black teachers lived on the periphery of the core area or in more outlying parts of the city yet were assigned to teach in the core area. The same study also indicates that 80% of the teachers surveyed used a privately owned automobile to travel to and from teaching, which indicates that the distance between home and teaching assignment would not be a primary concern for black teachers. The defendants have attacked this study as not taking into account where the surveyed teachers lived at the time they received their initial assignments. However, the study is entitled to some weight, for whether or not it pertains to initial or subsequent assignments of teachers, it still indicates that distance between home and assignment was not the main concern of black teachers.

F–20. The statements of a number of school administration officials provide direct evidence that the defendants were engaging in intentional discrimination against black teachers in teacher assignments, and the result of these placement practices—most black teachers teaching in schools having a large black student population—was not inconsistent with the Administration's view of which teachers would best serve the needs of individual schools. Olga Schlueter, who in 1965 was Executive Director of MPS's School Teacher Personnel Department and had been in that department since 1956, told a newspaper reporter that, in assessing a school's needs, it was often felt that black teachers were most needed in schools having black pupils. Moreover, in 1967, Harold Vincent, who had been Superintendent of Schools since 1950, admitted to Donald Feilbach, then MTEA president, that there had been a practice of assigning black teachers to schools with black students. Feilbach testified:

"He [Vincent] said that they had been doing it because he thought it had been the proper thing to do in the best interests of the teachers and the students, and that he felt now that it had perhaps been a mistake."

Feilbach also testified that Vincent told him that Vincent had mistakenly believed that

black teachers could best serve black students. Other statements in the record further indicate that MPS officials felt that black professionals could be best utilized on the staffs of schools having large black populations. These statements, together with the clear pattern of teacher segregation persisting since at least 1950, indicate that school officials intended to and did place most black teachers in those schools attended by most black students. This segregative intent provides the only credible explanation for the racial concentrations noted above.

Such statements are examples of the application of impermissible racial stereotypes in the process of teacher assignment and provide direct evidence of discriminatory intent by the defendants. Brem's memorandum entitled "A Look at a Big-City School Problem", exhibit number 1442, is particularly probative of the defendant's intent to maintain racial segregation out of a belief that blacks generally are different and not yet ready to mix with whites. Discriminatory intent is inherent in such statements.

The defendants have argued that these statements should not be given any weight by the court because some of them were made quite a long time ago, some of them were made to a newspaper reporter and are thus likely to be relevant only in the context of the particular questions asked by the reporter, and some of them were made by parties whose views cannot be ascribed to the defendants. However, the court believes that these statements by administration officials are entitled to weight. It is true that some statements were made to a newspaper reporter, but the statements continue to remain credible in light of the fact that no requests for retractions of the ascribed statements were ever made to the reporter by the speakers and that the statements are consistent with one another and with other indications of the administration attitude, such as the above-mentioned Brem memorandum. The statements by Vincent were made a long time ago, but the witness who heard the statements testified that they made a great impact upon him, which indicates that the witness is entitled to belief. Lastly, the defendants have argued that a statement, not specifically mentioned above, by Orrin Wang may not be relied upon since he was not associated with the defendants' teacher placement personnel office. However, Wang was the head of a department assigning other personnel to schools, and as such his statements may be relied upon.

F–21. The defendants were not significantly restricted in the assignment of teachers by a seniority agreement with the MTEA until the collective bargaining agreement for 1968 was adopted. MTEA officials testified that while some earlier collective bargaining agreements did contain some restrictions based upon seniority, the first effective seniority agreement was contained in the 1968 contract. An examination of the seniority provisions of the 1964 contract, the one that the defendants maintain took away their discretion in the assignment of teachers, contained in exhibit 1017 at 139–154, reveals that they are significantly weaker than the seniority provisions that the MTEA officials testified as being the effective provisions, contained in exhibit 1021 at 319. The defendants were not significantly restricted by the 1964 collective bargaining agreement from achieving a lesser degree of racial imbalance in the teaching staffs of the school system.

F–22. The final report of the Wisconsin Legislative Council's Advisory Committee on the Report of the National Commission on Civil Disorder (The "Little Kerner Commission") concluded in 1969, that most black teachers in the Milwaukee system have been assigned to predominantly black schools. The defendants have attacked this report as being both inadmissible hearsay and unreliable. However, as the report of an officially commissioned governmental organization, the report is admissible pursuant to Rule 803(8)(B) or (C) of the Federal Rules of Evidence, and the defendants' reliability argument that the report fails to inquire into how the black teachers came to be assigned to the black schools does not diminish the report's conclusion that black

teachers were indeed assigned primarily to black schools.

F–23. The defendants' defense based upon the claim that blacks preferred to live near their teaching assignments and upon the claim that the defendants could not assign the black teachers elsewhere due to the teacher shortage and the seniority provisions of the collective bargaining agreement is not supported by the evidence. The court concludes that the defendants were not compelled by circumstances beyond their control to assign black teachers primarily to core schools so as to accommodate the desires of the black teachers to be near home. The defendants retained sufficient control over the teacher assignment process to have achieved a much greater degree of integration than was actually achieved during the period involved in this case.

## C. *The Defendants' Responsibility for the Segregation of Teachers*

L–13. A concentration of black teachers in schools having a high percentage of black children is especially probative of school officials' segregative intent because of the high degree of control that these officials can exercise over faculty placement. See *U.S. v. Texas Education Agency*, 564 F.2d at 173–174 n. 19, and *Reed v. Rhodes*, slip op. at 42. Since at least 1949, Wisconsin law has provided that, in Milwaukee, the Superintendent of Schools has the legal responsibility for teacher assignments. See Wis.Stats. § 119.32(5)(1975); Wis.Stats. § 119.09(3) (1967); Wis.Stats. § 38.09(3) (1963); and Wis.Stats. § 38.09(3)(1949).

F–24. Prior to 1964, the year in which public employees in Wisconsin were given the right to organize, the superintendent's legal responsibility for teacher placement was not limited by any collective bargaining agreement. In January 1964, the Milwaukee Teachers' Education Association was certified as the teachers' exclusive bargaining agent. One of the MTEA's goals was to have a collective bargaining agreement with the school board which would guarantee teachers the right to voluntarily transfer to available positions in other schools in the system, with priority accorded to properly certified teachers in order of seniority. This goal was achieved when the school board ratified the 1968 collective bargaining agreement. Teacher transfer rights have been guaranteed by each subsequent contract between the school board and MTEA. To understand the relevance of the contractual transfer provisions to the intent issue, MPS staff placement practices before and after the 1968 contract negotiations must be reviewed.

F–25. There is no question that, prior to the school board's ratification of the collective bargaining agreement containing the seniority transfer provision, the Superintendent of Schools had the right and responsibility to assign and reassign teachers to the various schools within the system. The Superintendent's goal in placing teachers was to best serve the needs and interests of each school in the system. Since the Superintendent felt that this goal could not be attained by the application of a mechanical placement procedure, the judgment of the Administration's personnel office as to whether a particular teacher could best serve the needs of a particular school weighed heavily in the assignment process.

F–26. Although the transfer provision has played a significant part in maintaining teacher imbalance, it alone cannot be blamed for the faculty segregation which existed prior to the Court's January 19, 1976, decision. Vacancies which arise during the summer do not have to be filled on a seniority basis. The number of these summer vacancies varied from year to year, and, according to the testimony of various witnesses, ranged between 35–50% of all vacancies. Defendants had the freedom to fill these vacancies in accordance with their avowed staff profiling goal, designed to achieve more balanced faculties in each school with respect to ethnicity, education, experience, sex, age, and geographical background. However, working contrary to this goal was the weight given a new teacher's cultural background, including racial or ethnic considerations in filling vacancies. The

Department of Personnel felt that a teacher with a racial or ethnic affinity to the students in a particular school may be more effective in that school and that, according to the department's executive director, "[i]n the case of staffing inner city schools, we, as I mentioned before, look for people who have experience or cultural backgrounds that will qualify them there." The result of the various considerations employed by defendants in making staff assignments was that the strong racial imbalance in faculties which existed prior to the adoption of the contractual transfer provision continued, with defendants' acquiescence, after their ratification of the transfer provision.

■ F–27. In light of the foregoing findings of fact, the Court concludes that the defendants intentionally discriminated against black teachers by following a policy of assigning most black teachers to the staffs of identifiably black schools.

### D. Other Relevant Findings

F–28. Not only was the school system competing against other school districts for black teachers, but they were also competing against other employers who were hiring black individuals for nonteaching positions.

F–29. Some teachers, both black and white, did express a desire to teach near their homes, and the administration made every effort to honor their requests.

F–30. The administration made an effort to initiate a teacher exchange for one school year between central city and noncentral city schools. No one came forward to request participation in the proposed exchange program. There is no indication that the administration pursued this program with any vigor or serious attempt to effectuate a substantial alteration of the racial imbalance of its teaching staffs.

F–31. Assenting to the seniority provisions of the 1968 collective bargaining agreement is not evidence that the defendants were motivated by discriminatory intent, as the evidence indicates that they were giving in to pressure brought by the MTEA for the adoption of such provisions.

F–32. In the 1976 decision at 408 F.Supp. 797–798, the court found that one of the reasons for the racial imbalance on the teaching staffs was the result of the workings of "the seniority transfer procedure." The evidence adduced at the remand hearing indicates that that finding was in error as to the teacher assignments prior to 1968. Since 1968, it has had some effect. In the same paragraph, the court also found "there has never been any effort to keep black teachers from teaching in predominantly white schools." The evidence at the remand hearing indicates that this finding was also in error and it is therefore withdrawn.

### V. Intact Bussing

#### A. Definitions

F–33. During the 1950's and 1960's, defendants employed two primary methods of bussing students, referred to by the parties as "mixed bussing" and "intact bussing." Under "mixed bussing," designated students from a sending school district would be assigned to a receiving school where they would be considered part of the receiving school's student body, taught by teachers who were on the faculty of the receiving school, and were under the direct control of the receiving school's principal. Sometimes students from selected grades in the sending school or from a selected geographical area of the sending school were designated to be mixed bussed. The parents of children who were mixed bussed were considered members of the receiving school's parent-teachers association.

The defendants have agreed to this definition of mixed bussing except for the portion referring to parents being members of the receiving school's parent-teachers association. However, the testimony of William Seiser, the MPS Director of Facilities Planning and Administrative Research, indicates that parents generally belong to the parent-teachers association of the school which has the administrative responsibility for their children—the sending school in intact bussing situations and the receiving school in mixed bussing situations. (Tr. at 9184–85)

F–34. Mixed bussing was always used if transportation was provided because (a) there was no school building in the sending school district, (b) students lived an excessive distance from their district school, or (c) a safety hazard was in the students' paths to their district school. During the 1950's, mixed bussing was also used to give relief to overcrowded schools in outlying areas of the city. Prior to defendants' decision to discontinue intact bussing in 1971, students from majority black schools never were bussed under this method. However, some black students attending majority white schools were bussed on a mixed bussing basis along with the white students.

F–35. The other primary method of transportation was known as "intact bussing." Under this method, entire class groups from a sending school were picked up at the sending school and transported to a receiving school. These students were taught by teachers on the sending school's faculty and were under the primary control of the sending school's principal. The students who were intact bussed were still assigned to the sending school and were not considered part of the receiving school's student body. The parents of children who were intact bussed were regarded as members of the sending school's parent-teachers association.

The parties do not agree on what exactly are the characteristics of intact bussing. This disagreement is relevant, for depending upon which definition one chooses, particular situations of bussing may be classified as intact or as mixed, especially with regard to the bussing which occurred from outlying white schools during the period 1950–58. The defendants' position is that any bussing which involved a class being transported as a group from a school or an area with the class' teacher and being kept together for instructional purposes at the receiving school constitutes intact bussing. Thus the defendants would classify the bussing of a group of white students and their teacher as a unit from the 67th Street School district to the Oklahoma Avenue School in the second semester of the 1955–56 school year (testimony of William Seiser,

Tr. at 8960–61), and the bussing of a group of white students as a unit in the same school year from the 66th Street School to Garden Homes School (testimony of Kenneth Hitzke, a staffing specialist in the MPS Division of Personnel, Tr. at 9473) as intact bussing. However, even in those cases where defendants claim that students were kept in self-contained classes, the students were considered part of the receiving school. They had recess and lunch with the receiving school pupils; they were taught by teachers who were on the faculty roll of the receiving school; the receiving school principal was their principal; and their parents were members of the parent-teachers association of the receiving school. Furthermore, the evidence indicates that in many instances students bussed, because of the lack of space for them in their home districts, were not only part of the receiving school but also were organized into classes with children living in the district of the receiving school. All students bussed during this period were allowed to eat lunch at those receiving schools that had lunchroom facilities, and in two instances lunchrooms were specifically installed to accommodate bussed children. Therefore, the Court rejects the defendants' attempts to count as "intact bussing" those instances in which students were bussed into a receiving school and taught there as a unit but mixed in with the regular student population of the receiving school for all other purposes.

F–36. Starting with the initiation of the system's modernization program in the 1958–59 school year, students from schools being renovated were, with one exception, always bussed intact. This bussing usually lasted one semester or less. Prior to the elimination of intact bussing at the end of the 1971–72 school year, intact bussing was also used to relieve some overcrowding. A disproportionately large amount of intact bussing for this reason occurred from predominantly black schools. Intact bussing for overcrowding generally lasted only a few semesters. However, intact bussing out of 16 overcrowded sending schools, 11 of which were greater than 50% black when

the bussing started, and 13 of which were greater than 50% black when bussing ended, lasted an average of four years and ranged in duration from two years to eight years. Prior to its elimination in 1971, more than half of the approximately 509 instances of intact bussing, either for modernization or because of overcrowding, involved shifting pupils to schools with substantially smaller black populations, while approximately 2% involved transporting pupils to schools with a substantially larger black population.

### B. *The Development of MPS Bussing Practices*

F–37. The history of the defendants' transportation practices is complex. During the 1950–56 period, no bussing out of majority black schools occurred, and no bussing was occasioned by school modernization. However, at this time there was a significant amount of bussing caused by the overcrowding of existing school facilities in the newer, developing areas of the city. To alleviate the situation, the defendants typically responded in one of two ways.

F–38. One response was to create new school districts by ceding territory to the new districts from one or more districts whose school buildings were overcrowded and, at the same time, initiating the construction of buildings for the newly-created districts. Pending completion of the new school buildings, students from the newly-created districts were assigned to other schools having available space. Defendants' other typical response to overcrowding during the 1950–56 period was to enlarge existing facilities. Entire grades of students or students living in selected geographical areas of districts in which additions were being built would, pending completion of construction, be assigned to underutilized schools in the system. In both responses the result was that students living in certain districts were assigned and sometimes bussed to schools in other districts.

F–39. During the 1957–58 school year, the first instance of bussing out of majority black schools occurred. In that year, students from Lee (90–100% black), Lloyd (90–100% black), and Siefert (67–90% black) were bussed to the Jackson school building while additional classrooms were being constructed at each of the three schools. The previous year Jackson had been a 0–10% black school, but in the school board resolution ordering the Lee, Lloyd, and Siefert bussing to Jackson, Jackson was closed as a neighborhood school and its students reassigned to the Jefferson (0–10% black) School. The closing of Jackson as a neighborhood school appears to have been caused by the decline of school-age students in the Jackson school district population, and the evidence does not indicate that the transfer of the predominantly white children residing in the Jackson school district was accomplished in anticipation of the imminent arrival of black children from Lee, Lloyd, and Siefert.

F–40. This first episode of bussing from black schools is significant because intact bussing was used and it was looked upon at the time as a departure from pre-existing practices. At the July 30, 1957, meeting of the MPS Committee on Appointment and Instruction at which the plan for the intact bussing of Lee, Lloyd, and Siefert students was approved, the following statements were made:

> Superintendent Harold Vincent: "Our plan there is rather unique. We haven't done it before. What we would plan to do there is this. We would organize in Lee, and Siefert and Lloyd just exactly as we would if we were to have all the pupils in those buildings. For example, we would have three classes, let us say, of sixth grade pupils at Lloyd Street School taught by teachers A, B and C. All right. We would provide transportation for pupils who would report to Lloyd School in the morning and would be picked up from there and be taken down to Jackson. The teacher, of course, would report at Jackson School with the group. Then at noon those pupils would be picked up and taken back to Lloyd School, and then they would be picked up in the afternoon

and brought back down to Jackson, and after school taken back to Lloyd Street School.

"In other words, we keep the organization just exactly the same as we would have it now at the building if all of them could remain there. We simply come and pick them up and take them as a group to this other school. And then as soon as the building is completed, then that group will simply go into a classroom."

Board Member Clare Dreyfus: "They will have their teacher."

Superintendent Harold Vincent: "With their teacher. And we don't then integrate pupils from various areas into that and then have to tear it apart later on."

This dialogue at the committee meeting shows that a deliberate and considered decision to break with prior bussing policies was made upon the recommendation of the superintendent for this first instance of bussing students from black schools.

F–41. As was explained by then Superintendent Vincent, the Lee, Lloyd, and Siefert students bussed to Jackson would be taken back to their respective sending schools for lunch. At the time of that bussing, Lee, Lloyd, and Siefert did not have lunch facilities. The year prior to the bussing, however, Jackson had a lunch program. Students bussed as a unit from Morgandale School (0–10% black) to Mitchell School (0–10% black) in 1952 had been allowed to remain at Mitchell, the receiving school for lunch. Moreover, the defendants specially installed lunch facilities at two receiving schools in the early 1950's to accommodate students from white schools who were mixed bussed there. Based on this information, the plaintiffs have attempted to characterize the failure to provide lunch facilities for the black children bussed from Lee, Lloyd, and Siefert to Jackson as showing that the defendants gave different treatment to black bussed children than to white bussed children with regard to lunch practices. However, this information cannot support such an inference. It was necessary that the Lee, Lloyd, and Siefert students be returned to their home schools for lunch because the bussing to Jackson was only scheduled to last for two months, which would have been too short a time to arrange to conduct a lunch program at Jackson. The instances of bussing involving white students in the early 1950's in which lunch facilities were installed at the receiving schools for the use of the white students were different than the Lee, Lloyd, and Siefert bussing to Jackson, since those earlier instances involved bussing for periods longer than two months. Thus, the handling of the lunch program at Jackson does not show disparate treatment of the bussed-in blacks.

F–42. In September 1958, the school board passed a resolution giving the superintendent authority to bus students intact whose schools would be renovated as part of defendants' program of modernizing some 50 aging schools. At the time the bussing resolution was adopted, defendants had actual knowledge of the schools scheduled for modernization over the next several years, and a sizeable number of these schools were then in or near the areas of the city where most blacks lived. Most of the 50 schools to be renovated were majority white schools at the time the resolution was passed, but many of those schools were located in areas that were known to be racially changing. In the bussing resolution, defendants stated that when students were bussed due to modernization, " * * * we should pick them up at their own school building in the morning; return them at noon; pick them up again after lunch, and return them to the building in the afternoon." (Document 23, Exh. 1450) In discussing this contemplated bussing procedure in defendants' Finance Committee, one board member noted it was "appropriate" because of the kind of "hackling" that can result. Moreover, the Superintendent told the committee that "[t]hat is what we did at Jackson," referring to the intact bussing out of predominantly black Lee, Lloyd, and Siefert Schools. The history of bussing up to 1958 reveals that until bussing out of predominantly black schools first occurred (1) intact bussing was not generally used, and (2) bussed students were not, as a matter of

policy, restricted from staying for lunch at the receiving schools.

F–43. The practice of not permitting intact bussed students to stay for lunch at the receiving school is suspicious for at least three reasons. First, as noted above, the inception of the practice coincided with the need for bussing out of predominantly black schools. Second, the practice is inconsistent with defendants' claimed concern, voiced throughout all hearings in this case, that bussing is undesirable because it results in lost classroom time and added monetary expense. The practice of requiring bussed students to be returned to their sending schools at lunchtime, even if the receiving school had a lunch program, inevitably but unnecessarily resulted in lost classroom time and added transportation cost. Testimony indicated that bussing was the defendants' last priority for relieving overcrowding in schools. (Tr. at 9188–90, Seiser) Finally, during the 1958–63 period, defendants permitted some exceptions to their practice of requiring intact bussed students to be returned to the sending school at lunch. In 10 of the 12 semesters comprising this period, students from 9 sending schools in the 0–10% black range stayed for lunch at 13 different receiving schools which were also 0–10% black as shown by the following table derived from Exhibit 6061:

INSTANCES OF BUSSING IN WHICH STUDENTS FROM 0–10% BLACK SENDING SCHOOLS REMAINED FOR LUNCH AT 0–10% BLACK RECEIVING SCHOOLS DURING THE 1958–59 TO 1963–64 SCHOOL YEARS

| SEM. | YEAR | SENDING | RECEIVING |
|------|------|---------|-----------|
| I | 1958–59 | 66th (0–10% B) | Garden Homes (0–10% B)<br>Auer (0–10% B)<br>Green Bay (0–10% B)<br>Edison Jr. (0–10% B) |
| II | 1958–59 | 66th (0–10% B) | Green Bay (0–10% B)<br>Garden Homes (0–10% B)<br>Auer (0–10% B)<br>Edison Jr. (0–10% B) |
| I | 1959–60 | Parkview (0–10% B)<br>Dover (0–10% B) | Emerson (0–10% B)<br>Lincoln (0–10% B)<br>Oklahoma (0–10% B) |
| II | 1959–60 | Parkview (0–10% B)<br>Dover (0–10% B) | Emerson (0–10% B)<br>Lincoln (0–10% B)<br>Oklahoma (0–10% B) |
| I | 1960–61 | Longfellow (0–10% B)<br>Victory (0–10% B) | Walker Jr. (0–10% B)<br>Kilmer (0–10% B) |
| II | 1960–61 | Kagel (0–10% B) | Walker Jr. (0–10% B) |
| I | 1961–62 | None | None |
| II | 1961–62 | E. Granville (0–10% B) | 35th (0–10% B)<br>36th (0–10% B) |
| I | 1962–63 | Whitman (0–10% B) | Curtin (0–10% B) |
| II | 1962–63 | Whitman (0–10% B) | Curtin (0–10% B) |
| I | 1963–64 | 78th (0–10% B) | Fairview (0–10% B) |

The defendants must have known of these deviations because the transportation contracts and bussing summaries approved by the school board indicated whether or not noon transportation would be required. During this same period, no students from majority black sending schools were ever allowed to stay for lunch at their receiving schools, even though some of these students from these black schools were bussed to the same receiving schools at which students from the white sending schools previously had stayed for lunch. Moreover, the distances between some predominantly black sending schools and their respective receiving schools were approximately the same

as, and in some cases were appreciably greater than, the distances between some predominantly white sending schools and the receiving schools at which students from these white schools stayed for lunch.

There were, however, 54 instances of bussing from 14 majority white sending schools to other majority white receiving schools in which the bussed-in students were returned to their respective sending schools for lunch. However, in only 25 of these 54 instances did the receiving school have lunch facilities. The 54 instances are listed in the following table, derived from Exhibit 6061, and an asterisk before the name of the receiving school indicates that the school had lunch facilities.

### INSTANCES OF BUSSING IN WHICH STUDENTS BUSSED FROM MAJORITY WHITE SENDING SCHOOLS TO OTHER MAJORITY WHITE RECEIVING SCHOOLS DID NOT REMAIN AT THE RECEIVING SCHOOL FOR LUNCH DURING THE 1959–60 TO 1963–64 SCHOOL YEARS

| SEM. | YEAR | SENDING | RECEIVING |
|---|---|---|---|
| I | 1959–60 | Dover (0–10% B) | * Mound (0–10% B)<br>Fernwood (0–10% B) |
| II | 1959–60 | Dover (0–10% B) | * Mound (0–10% B)<br>Fernwood (0–10% B) |
| I | 1960–61 | Longfellow (0–10% B) | Doerfler (0% B)<br>Greenfield (0% B)<br>* Lincoln (0% B) |
| I | 1960–61 | Mitchell (0–10% B) | Wilson Park (0% B)<br>Fernwood (0% B)<br>* Riley (0% B) |
| I | 1960–61 | Victory (0% B) | * Kilmer (0% B) |
| II | 1960–61 | Auer (1.7% B) | Philipp (5% B)<br>* Green Bay (11% B)<br>Sherman (0% B)<br>Hi-Mount (0% B)<br>* Garden Homes (0% B)<br>Thirty-Fifth (0% B) |
| II | 1960–61 | Kagel (0% B) | Doerfler (0% B)<br>Greenfield (0% B)<br>* Lincoln (0% B) |
| II | 1960–61 | Mitchell (0% B) | Wilson (0% B)<br>Fernwood (0% B)<br>* Riley (0% B) |
| I | 1961–62 | Bartlett (0–10% B) | * Green Bay (10–33% B)<br>* Garden Homes (0–10% B)<br>Philipp (10–33% B)<br>Thirty-Fifth (0–10% B)<br>* Twenty-Fourth (0–10% B) |
| I | 1961–62 | Maryland Ave. (0–10% B) | * Jefferson (0–10% B)<br>* Eighth (10–33% B) |
| I | 1961–62 | Trowbridge (0–10% B) | * Riley (0–10% B)<br>Fernwood (0–10% B)<br>Dover (0–10% B) |
| II | 1961–62 | Bartlett (0–10% B) | * Green Bay (10–33% B)<br>* Garden Homes (0–10% B)<br>Philipp (10–33% B)<br>Thirty-Fifth (0–10% B)<br>* Twenty-Fourth (0–10% B) |
| II | 1961–62 | Maryland (0–10% B) | * Jefferson (0–10% B)<br>* Pierce (10–33% B)<br>* Green Bay (10–33% B)<br>* Eighth (10–33% B) |

| SEM. | YEAR | SENDING | RECEIVING |
|------|------|---------|-----------|
| I | 1962–63 | Thirty-Seventh (0–10% B) | Hi-Mount (0–10% B)<br>* Hawley (0–10% B)<br>Thirty-Eighth (0–10% B)<br>Sherman (0–10% B)<br>Townsend (0–10% B) |
| I | 1963–64 | Seventy-Eighth (0–10% B) | MacArthur (0–10% B) |
| I | 1963–64 | Twenty-Seventh (13% B) | * Burbank (0% B)<br>* Hawley (0% B)<br>Story (16% B)<br>Wisconsin Ave. (23% B) |
| II | 1963–64 | Seventy-Eighth (0% B) | MacArthur (0% B) |
| II | 1963–64 | Thirty-Sixth (0% B) | Silver Spring (2% B) |

* These schools had lunch facilities.

In addition, during this period there were 17 instances of bussing from 6 majority black sending schools to other majority black receiving schools in which the bussed-in students were returned to their sending schools for lunch. However, in only 6 of the 17 instances did the receiving school have lunch facilities. The following table, derived from Exhibit 6061, lists the 17 instances, and an asterisk before the name of the receiving school indicates that the school had lunch facilities.

INSTANCES OF BUSSING IN WHICH STUDENTS BUSSED FROM MAJORITY BLACK SENDING SCHOOLS TO OTHER MAJORITY BLACK RECEIVING SCHOOLS DID NOT REMAIN AT THE RECEIVING SCHOOL FOR LUNCH DURING THE 1959–60 TO 1963–64 SCHOOL YEARS

| SEM. | YEAR | SENDING | RECEIVING |
|------|------|---------|-----------|
| I | 1959–60 | Twelfth (67–90% B) | * Roosevelt (90–100% B) |
| II | 1959–60 | Twelfth (67–90% B) | Old Palmer ( +50% B)<br>* Roosevelt (90–100% B) |
| I | 1960–61 | LaFollette (79% B) | * Palmer (67% B) |
| II | 1960–61 | LaFollette (79% B) | Old Palmer (67% B)<br>Fifth (99% B)<br>Center (50% B) |
| I | 1961–62 | Twentieth (67–90% B) | * Fifth (90–100% B)<br>Old Palmer (67–90% B) |
| II | 1961–62 | Twentieth (67–90% B) | Twenty-First ( +50% B)<br>* Fifth (90–100% B)<br>Center ( +50% B)<br>Old Palmer (67–90% B) |
| I | 1962–63 | Lee (90–100% B) | Center (67–100% B) |
| II | 1962–63 | Garfield (90–100% B) | * Fifth (90–100% B)<br>Center (67–90% B) |
| I | 1963–64 | Ninth (99% B) | Center (99% B) |

* These schools had lunch facilities.

Moreover, as shown by the following tables derived from Exhibit 6061, it was not distances between sending and receiving schools that caused the defendants frequently to allow students from white schools to remain at the receiving schools for lunch while black students were bussed home to their sending schools. The first table indicates the distances between predominantly white sending schools and the predominantly white receiving schools at which the students were allowed to remain for lunch.

DISTANCES BETWEEN SENDING AND RECEIVING SCHOOLS IN INSTANCES OF BUSSING IN WHICH STUDENTS FROM PREDOMINANTLY WHITE SENDING SCHOOLS REMAINED FOR LUNCH AT PREDOMINANTLY WHITE RECEIVING SCHOOLS DURING THE 1959–60 TO 1963–64 SCHOOL YEARS

| SEM. | YEAR | SENDING | RECEIVING | DISTANCE |
|------|------|---------|-----------|----------|
| I | 1959–60 | Parkview (0–10% B) | Emerson (0–10% B) | 2¼ mi. |
| II | 1959–60 | Parkview (0–10% B) | Emerson (0–10% B) | 2¼ mi. |
| I | 1960–61 | Longfellow (0–10% B) | Walker (0–10% B) | 1¼ mi. |
| II | 1960–61 | Kagel (0–10% B) | Walker Jr. (0–10% B) | 1¾ mi. |
| I | 1962–63 | Whitman (0–10% B) | Curtin (0–10% B) | 2½ mi. |
| II | 1962–63 | Whitman (0–10% B) | Curtin (0–10% B) | 2½ mi. |
| I | 1963–64 | S. 78th St. (0–10% B) | Fairview (0–10% B) | 1¾ mi. |

The second table indicates the distances between majority black sending schools and the majority white receiving schools at which the bussed-in students from the black schools were not allowed to remain for lunch.

DISTANCES BETWEEN SENDING AND RECEIVING SCHOOLS IN INSTANCES OF BUSSING IN WHICH STUDENTS FROM MAJORITY BLACK SENDING SCHOOLS DID NOT REMAIN FOR LUNCH AT MAJORITY WHITE RECEIVING SCHOOLS DURING THE 1959–60 TO 1963–64 SCHOOL YEARS

| SEM. | YEAR | SENDING | RECEIVING | DISTANCE |
|------|------|---------|-----------|----------|
| II | 1959–60 | 12th (67–90% B) | 8th (10–33% B) | 2¼ mi. |
| I | 1960–61 | 5th (99% B) | 8th (10–33% B) | 2½ mi. |
| I | 1961–62 | 20th (67–90% B) | Garden Homes (0–10% B) | 2½ mi. |
| II | 1961–62 | 20th (67–90% B) | Jefferson (0–10% B) | 2½ mi. |
| I | 1962–63 | Lee (90–100% B) | Green Bay (0–10% B) | 2 mi. |
| | | Lee (90–100% B) | Garden Homes (0–10% B) | 3 mi. |
| II | 1962–63 | McKinley (67–90% B) | 24th (0–10% B) | 4½ mi. |
| | | McKinley (67–90% B) | Garden Homes (0–10% B) | 3½ mi. |
| I | 1963–64 | Brown (83% B) | Hawley (0–10% B) | 3½ mi. |
| | | Hopkins (99% B) | 35th (0–10% B) | 2½ mi. |
| | | LaFollette (98% B) | 24th (0–10% B) | 2½ mi. |
| | | Ninth (99% B) | Green Bay (0–10% B) | 2½ mi. |
| | | Ninth (99% B) | Garden Homes (0–10% B) | 3¼ mi. |

The evidence establishes that there was no relationship between the distances students were bussed from sending to receiving schools and staying for lunch or being returned to the sending school, for as the tables indicate, the distances to be traveled were comparable whether the sending school was white or black.

To summarize this finding, the evidence shows that students from white schools bussed into other white schools sometimes did and sometimes did not stay at the receiving school for lunch. Similarly, students from black schools bussed into other black schools sometimes did and sometimes did not stay at the receiving school for lunch. *However, in no instance did students from a black school bussed into a white school remain at the white school for lunch.*

F–44. These three factors discussed in the previous finding give rise to the infer-

ence that the practice of returning bussed students to their sending school at lunchtime was inspired by a desire to prevent students from white receiving schools from having to share their lunchrooms with large numbers of black students. This inference is corroborated by the testimony of the project director of the U. S. Civil Rights Commission study of the Milwaukee Public School System, which project director stated that a board member told him that children from black schools had bad habits and that white parents would object to allowing them to eat with their children. Although the board member denied making these remarks, she admitted that she told the project director, and she made a similar statement in court, that Milwaukee's German citizens would not "be pushed around and made to do things they did not want to do and that if blacks were brought into white classrooms under forced circumstances there would be trouble." She also admitted making a remark, reported in the newspapers in 1963, to the effect that newly-migrated students from the South often urinated in water fountains. In light of the evidence, the explanation attributed to this board member provides the only "logical" reason for defendants' initiating a practice requiring the return of children to their sending school at lunchtime.

## C. The Defendants' Response to Overcrowding in the Schools

F–45. The bussing during the 1958–63 period also reveals that students bussed from predominantly black schools were treated differently in several respects than students transported from predominantly white schools. Defendants' response to overcrowding is the first example of this disparate treatment. During 1958–59, the only bussing for overcrowding occurred out of the Engleburg (0–10% black) and 66th Street (0–10% black) Schools. The only bussing for overcrowding during the first semester of the 1959–60 school year was from Engleburg (0–10% black) and Parkview (0–10% black) Schools. In each instance, entire grade levels of students from these white sending schools were bussed to

several receiving schools in the 0–10% black range. In all cases, the bussed students were accounted for on the membership reports of the receiving schools, were taught by teachers on the receiving schools' faculties, and were under the disciplinary control of the receiving schools' principals. The bussed students were not returned to the sending schools at lunchtime. To accomplish this, defendants passed resolutions which reorganized the sending schools by removing from those schools the grade levels of the students transported.

During the second semester of the 1959–60 school year, the bussing, due to overcrowding at the Engleburg and Parkview Schools, continued in the same manner as it had the previous semester. In addition, that semester students from the LaFollette (67–90% black) School were bussed because of overcrowding to the Green Bay Avenue (0–10% black) School. However, unlike the bussing from the virtually all-white schools, the students from the predominantly black LaFollette School remained on the membership roll of the sending school, were taught by faculty members from the sending school, and were under the primary control of the sending school's principal. Defendants did not reorganize LaFollette School so that the bussed students would be part of the organization of the receiving school. Moreover, the LaFollette students were returned to the sending school at lunchtime even though the Green Bay Avenue School had a lunch program and even though the 66th Street students bussed to Green Bay Avenue the previous year had stayed there for lunch. Thus, the bussing out of LaFollette was intact.

The defendants have raised a number of objections to this finding. First, they have argued that the 1958–59 bussing out of the Engleburg and 66th Street Schools and the 1959–60 bussing out of the Engleburg and Parkview Schools were instances of intact rather than mixed bussing. The defendants are in error, and those instances of bussing were mixed rather than intact under the definitions of intact and mixed

bussing discussed in findings F–33 and F–35 above. In these instances, all the bussed-in students were carried on the rolls of the receiving schools, were subject to discipline from the receiving schools' principals, and remained for lunch at the receiving schools.

Second, the defendants maintain that a grade reorganization of the LaFollette School in the second semester of 1959–60, like the grade reorganizations at Engleburg, 66th Street, and Parkview Schools in the 1958–59 school year and the first semester of the 1959–60 school year, could not be accomplished because there were too many students at LaFollette in any given grade to be reorganized. But even if one accepts this as a sufficient justification for not reorganizing the majority black LaFollette School, it does not follow that the students bussed out of LaFollette had to be bussed on an intact basis. They could have been bussed on a mixed basis even without a grade reorganization.

Third, the defendants contend that the LaFollette students were bussed back to LaFollette from the Green Bay School for lunch while the students bussed in from the white 66th Street School the previous year were allowed to remain at Green Bay for lunch during the previous year because the LaFollette School was much closer to the Green Bay School than was the 66th Street School. However, this explanation is insufficient, for as noted above in finding F–43, there was no relationship whatsoever between the distance from a sending to a receiving school and students staying for lunch or being returned to their sending school.

## D. *The Defendants' Recess Practices*

F–46. Another indication of disparate treatment during 1958–63 concerns recess practices. During this period, students intact bussed from predominantly black sending schools to several predominantly white receiving schools were sometimes required to have their recesses at separate times from the receiving school's children. The first instance of separate recesses occurred during the second semester of the 1959–60 school year when for the first time students from a predominantly black school were bussed to a school with a predominantly white student body. Other instances throughout the period occurred until the end of the 1962–63 school year. The evidence does not indicate that at all predominantly white receiving schools it was uniformly the practice to have separate recesses for students intact bussed from predominantly black sending schools. Defendants' uncontroverted proof indicates that in three instances involving three different 0–33% black receiving schools—35th Street School, 68th Street School, and Burbank School—in the second semester of the 1962–63 school year, students from 67–100% black schools—Hopkins and McKinley—had joint recesses with the receiving school's children. Students from 67–100% black schools were bussed to these 0–33% black receiving schools in three instances prior to the halting of separate recesses at the end of the 1962–63 school year. On the other hand, plaintiffs' uncontroverted proof shows that in a total of five instances involving five different 0–33% black receiving schools, students from the 67–100% black sending schools had separate recesses from the receiving school's children. The five instances of separate recesses are set forth in the following table.

INSTANCES OF BUSSING IN WHICH STUDENTS FROM MAJORITY BLACK
SENDING SCHOOLS HAD SEPARATE RECESSES AT MAJORITY WHITE
RECEIVING SCHOOLS DURING THE 1959–60 TO 1962–63 SCHOOL YEARS

| SEM. | YEAR | SENDING SCHOOL | RECEIVING SCHOOL |
|------|------|----------------|------------------|
| II | 1959–60 | 12th (67–90% B) | 8th (0–33% B) |
| II | 1960–61 | LaFollette (79% B) | Pierce (9% B) |
| I | 1962–63 | Lee (90–100% B) | Jefferson (0–10% B) |
| I | 1962–63 | Lee (90–100% B) | Garden Homes (0–10% B) |
| II | 1962–63 | Brown (67–90% B) | Hi-Mount (0–10% B) |

Students from 67–100% black schools were bussed to the same 0–33% black receiving schools, a total of sixteen instances prior to the end of the 1962–63 school year. The sixteen instances involved the schools in the following table.

INSTANCES OF BUSSING DURING THE 1959–60 TO 1962–63 SCHOOL YEARS
IN WHICH STUDENTS FROM MAJORITY BLACK SENDING SCHOOLS
WERE BUSSED TO MAJORITY WHITE RECEIVING SCHOOLS SHOWN
TO HAVE HAD SEPARATE RECESSES FOR SOME BUSSED-IN
STUDENTS

| SEM. | YEAR | SENDING SCHOOL | RECEIVING SCHOOL |
|------|------|----------------|------------------|
| II | 1959–60 | 12th (67–100% B) | 8th (10–33% B) |
| I | 1960–61 | 5th (97% B) | Jefferson (0–10% B) |
| I | 1960–61 | 5th (97% B) | 8th (10–33% B) |
| II | 1960–61 | LaFollette (79% B) | Garden Homes (0–10% B) |
| II | 1960–61 | LaFollette (79% B) | Pierce (9% B) |
| I | 1961–62 | 20th (67–100% B) | Garden Homes (0–10% B) |
| II | 1961–62 | 20th (67–100% B) | Garden Homes (0–10% B) |
| II | 1961–62 | 20th (67–100% B) | Jefferson (0–10% B) |
| I | 1962–63 | Lee (90–100% B) | Garden Homes (0–10% B) |
| I | 1962–63 | Lee (90–100% B) | Jefferson (0–10% B) |
| I | 1962–63 | Lee (90–100% B) | 8th (10–32% B) |
| I | 1962–63 | McKinley (67–100% B) | 8th (10–33% B) |
| II | 1962–63 | Brown (67–90% B) | Hi-Mount (0–10% B) |
| II | 1962–63 | Garfield (90–100% B) | Jefferson (0–10% B) |
| II | 1962–63 | McKinley (67–100% B) | Garden Homes (0–10% B) |
| II | 1962–63 | McKinley (67–100% B) | 8th (10–33% B) |

The parties' proof conflicted with respect to the recess practices at one 0–33% black receiving school, Sherman, which received students from a 67–100% black school, McKinley, on only one occasion through the 1962–63 school year. No proof was presented involving the recess practices in eighteen other instances of bussing which occurred during this period from 67–100% black sending schools to 0–33% black receiving schools. After the end of the 1962–63 school year, the defendants did emphasize to receiving school principals that "every effort should be made to create a feeling of acceptance and belonging" for the bussed-in students. (Exhibits 6038 and 6035)

F–47. The evidence does not indicate that the school board ever had a policy requiring separate recesses for any children. Prior to the 1963–64 school year, the school board delegated responsibility for recess practices to the Superintendent and his staff, who in turn delegated control of the matter to the principals in each school. The separate recesses which did occur, therefore, were the decisions of individual school principals, but the school board members were aware of the practices.

L–14. However, the fact that the decisions to have separate recesses were made by individual principals does not absolve the defendants of responsibility for the segregated recesses which occurred. The requirements of the Constitution cannot be avoided by a fragmentation of authority among various government agents. *Cooper v. Aaron*, 358 U.S. 1, 15–17, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958); *United States v. Board of School Commissioners of the City of Indianapolis*, supra at 410. Moreover, since a school system, like a corporation, acts through its officers and agents, Courts have concluded that the doctrine of *respondeat superior* requires that the purposes, motives, and intent of these agents or officers should be considered those of the entity. See, e. g., *New York Central and Hudson River Railroad Co. v. United States*, 212 U.S. 481, 494, 29 S.Ct. 304, 53 L.Ed. 613 (1909); and *United States v. Harry L. Young & Sons*, 464 F.2d 1295, 1296 (10th Cir. 1972).

F–48. Defendants' responsibility for segregated recesses is not predicated solely on the imputed acts of school principals, for the evidence indicates that defendants at the minimum tolerated these separate recesses. Members of the Superintendent's staff would often visit schools. For example, the Assistant Superintendent in charge of elementary schools would visit elementary schools on an irregular basis, and curriculum supervisors in each academic area, including social studies, reading, physical education, music, and art, would go to these schools at least once every two months to confer with teachers and principals. In addition, principals' meetings were held approximately once a month to discuss various matters with the Superintendent or his representative. In light of this frequent contact, this Court finds that administration officials were not ignorant of the instances of separate recesses—spanning seven semesters—which continued until their occurrence was publicized by the press and civil rights groups at the start of the 1963–64 school year. Moreover, a former principal called by defendants testified on cross-examination that the Superintendent told principals that they were responsible for handling certain situations on an individual basis "because all school communities are different * * * [the principals know their communities] * * * and what might be good for one school community may not be advisable in another school situation." This former principal also testified that, as he understood this communication, if a principal thought it was best to have separate recesses when black children came to a predominantly white school, it was within his province to do so and that he had heard from other principals that this had in fact been done. Defendants cannot engage in such foreseeably segregative acts as intact bussing black children and returning them to their sending schools for lunch and then be held blameless when the principals to whom they have delegated control over recess practices feel justified in requiring separate recesses for students bussed from some predominantly black schools.

The defendants have argued that there is no evidence that administration officials ever actually saw any of the instances of separate recesses or ever explicitly authorized the practice of conducting separate recesses. Nevertheless, in light of the duties of the administration personnel to supervise the various facets of activity in the schools of the MPS system and the direct responsibility of the administration officials for creating the intact bussing policy, including requiring the bussing of many black students back to their sending schools for lunch and the outspokenness of the critics of the practice while it was occurring, this Court is persuaded to find that the administration personnel were aware of the practice of separate recesses in certain schools.

The defendants have further argued that because only five instances of separate recesses actually were established out of a total of 509 instances of intact bussing, the evidence is simply too weak to permit an inference of discriminatory intent to arise based on separate recesses. In this argument the defendants are in error. While it is true that there were approximately 509

instances of intact bussing the number of instances of intact bussing from majority black schools to majority white schools is smaller. Moreover, while there were only five proven instances of separate recesses, there were a total of sixteen instances of intact bussings from majority black schools into the five majority white schools proven to have engaged in the practice of separate recesses. This evidence is sufficient to give rise to an inference that there actually were more than five instances in which separate recesses occurred. To require the plaintiffs to actually prove the occurrence of separate recesses in most, or at least a majority, of the 509 instances of intact bussing, as the defendants apparently argue should be required, would be to impose an impossible burden of proof upon the plaintiffs in light of the passage of time and the fading of memories since the relevant time period.

F–49. Through their condonation of the practice of separate recesses for black and white children and through their vicarious liability for the acts of the principals who actually conducted the separate recesses, the defendants intentionally discriminated against black children.

E. *The Bussing into the 68th Street School*

F–50. Bussing into the 68th Street School provides the final example of how the treatment of students from predominantly black sending schools differed from that of students from predominantly white sending schools during the 1958–63 period. Throughout this period, the 68th Street School had a small, dwindling district enrollment consisting almost exclusively of white children. By 1960, the schools' small enrollment had made it difficult to organize the school without having students from three or more grade levels assigned to one class where they were all taught by the same teacher. Even with these multi-grade classes, the school's classes would be substantially smaller in size than the system-wide average. As a result, the Superintendent recommended to a school board committee that when students from Auer Avenue School were to be bussed during the renovation of their school, some of the Auer students be bussed to the 68th Street School and mixed into classes with the receiving school students. The deviation from defendants' intact bussing policy was carried out at defendants' direction during the second semester of the 1960–61 school year, and, consequently, for one semester some Auer students became part of the 68th Street School's student body and were taught by teachers who were on that school's faculty. The mixing of the Auer and 68th Street students into the same classes permitted the organization of classes of near normal sizes and with fewer grade levels per class. At the time of this bussing, Auer Avenue School was 1.7% black and the 68th Street School was 0% black.

F–51. During the following school year, students from the Bryant school district, who were predominantly, if not all, white, were mixed bussed into the 68th Street School while the Bryant school building was being constructed. While at the 68th Street School, the Bryant students were part of the 68th Street School student body and were integrated into classes with students living in the 68th Street school district. The next bussing into the 68th Street School occurred in the second semester of the 1962–63 school year when students from the McKinley School (67–90% black) were transported there during the modernization of their school. Unlike the previous bussing into the 68th Street School, this bussing was, on directions from the Central Administration, on an intact basis. The McKinley students were organized into their own classes, were taught by McKinley teachers, and were under the supervisory control of the McKinley principal. They were not part of the 68th Street student body and merely used classrooms at the receiving school.

F–52. The subsequent bussing into the 68th Street School, all of which was intact, is indicated by the following table.

INSTANCES OF BUSSING INTO 68TH STREET SCHOOL IN THE 1963–64 AND 1964–65 SCHOOL YEARS

| SEM. | YEAR | SENDING SCHOOL | NUMBER OF CLASSES | REASON |
|------|------|----------------|-------------------|--------|
| I | 1963–64 | Lloyd (99% B) | 2 | Overcrowding |
| I | 1963–64 | Elm (9.3% B) | 2 | Overcrowding |
| II | 1963–64 | Lloyd (99% B) | 2 | Overcrowding |
| II | 1963–64 | 20th (96% B) | 2 | Overcrowding |
| I | 1964–65 | Lloyd (99% B) | 1 | Overcrowding |
| I | 1964–65 | 20th (97% B) | 2 | Overcrowding |

At the end of the 1964–65 school year, defendants closed the 68th Street School as a district school because its district enrollment was too small to operate efficiently. Throughout the period of intact bussing, however, it operated with abnormally small classes for its district pupils, with three or more grade levels of students in each class. Defendants' failure to remedy this condition by mixing the mostly black students bussed there into classes with the 68th Street students, as they had when mostly white students were bussed in, provides further evidence that defendants were unwilling to require white students to attend classes with large numbers of black children.

By way of explanation of the bussing into the 68th Street School, the defendants have argued that the students bussed into the school from majority black schools were not mixed with the regular student population as the students bussed from majority white schools had been because the classes at the 68th Street School were too small and the school was scheduled to close. This explanation gives no reason why students bussed in from white schools under identical circumstances were not treated in the same manner. The evidence compels the finding that the different treatment was because the defendants wanted to "guard" the white children from associating with the incoming black children. The fact that the classes were too small at best provides only a valid nonracial reason for closing the school, not for treating the blacks who attended it prior to the closing differently than the whites.

### F. *Other Relevant Events*

F–53. During the summer prior to the 1963–64 school year, a considerable amount of media coverage concerning school segregation resulted in the school board's creation of its Special Committee on Equal Educational Opportunity. Members of several civil rights groups came before the committee to demand the end both of intact bussing and of the separate recesses and lunch programs that accompanied it. Early in the 1963–64 school year, school officials issued a memorandum "clarifying" their transportation policy, which resulted generally in the elimination of separate recesses. At the same time the president of the school board noted that any integration resulting from this policy was accidental. During the second semester the school board permitted all students bussed intact to stay at those receiving schools which had lunch programs. Although defendants acted during the 1963–64 school year to permit bussed students to be integrated in lunch and recess programs, they nevertheless failed to act to eliminate intact bussing.

F–54. In subsequent years, various governmental, community, civil rights, and teacher groups petitioned the school board to halt intact bussing. Black leaders told defendant that intact bussing caused "damaging psychological and sociological consequences" and that the excuses given for its use "cannot conceal the fact of segregation and the indifference of school officials to the humiliation of the children." The Urban League advised defendants that its black teachers who had been involved in

intact bussing indicated that the teachers felt the practice had an injurious effect upon their students. Governor Knowles' Commission on Human Rights, in urging the elimination of intact bussing on an experimental basis, reported to the school board that intact bussing was "one of the most troublesome and irritating aspects of racial imbalance in the schools." Finally, when these requests were ignored, civil rights groups began picketing various sending and receiving schools.

The defendants have urged that these statements by the various community, teacher, and governmental organizations may not be used to prove the truth of the matter asserted in the statements—that black children have suffered psychological injury and that the practice of intact bussing is very degrading. The Court accepts these statements as indicating the level of community concern over the defendants' use of the practice of intact bussing and the defendants' awareness of that concern.

F–55. In reaction to these events, in September 1965, three board members introduced a resolution before the Special Committee on Equality of Educational Opportunity that sought a one-year test of mixing into receiving school classes one or more classes of students who would otherwise have been intact bussed. Four of the seven members of the committee boycotted the first two committee meetings at which this pilot project was to be discussed, and as a result, a quorum was lacking. In the meantime, defendants received letters from school officials in Denver, Detroit, St. Louis, Kansas City, Pittsburgh, and also from other smaller cities indicating that intact bussing was not used in most of those cities where bussing occurred for as long as one year and was not used in any of those cities if it occurred for more than one year. A quorum of the special committee finally was present on October 13, 1965. At that time, the four members who had stayed away from the previous two meetings were successful in passing a resolution referring the pilot-project resolution to the Superintendent for further study. When the Superintendent reported back to the special

committee on December 2, 1965, these four members again successfully voted to have the matter referred back to the Superintendent. Finally, at the May 20, 1966, committee meeting, these same board members were successful in passing a substitute motion with the result that instead of the pilot project, the committee authorized a study of "human relations improvement" in a racially changing school. Thus, the special committee rejected an opportunity to test on a minimal scale the feasibility of using mixed bussing instead of intact bussing.

Strong evidence that the committee was motivated by discriminatory intent is provided by the fact of the committee's refusal to implement the proposal for mixed bussing, a proposal which would have had an obvious integrative impact and which raised the spectre of wholesale adoption of the proposal throughout the school system if the pilot project proved successful, with the concomitant widespread mixing of black and white children in the system. The comments of a number of board directors indicate that it was a fear of the possibility of the widespread adoption of the proposal that spurred the committee to reject the proposal. Moreover, the suspicious behavior of the boycotting committee members prior to the ultimate rejection of the proposal further lends support to an inference of discriminatory intent.

The defendants, however, have argued that it was only a legitimate concern with the educational merits of the proposal that led to the proposal's defeat. They offer the following reasons as indicating that the proposal lacked educational merit: (1) children would have been bussed more than six months under the proposal; (2) the bussed children would be primary school children; (3) the proposal was contrary to the "neighborhood" school policy; and (4) the proposal would have worked against the objective of eliminating bussing from the system. In reality, these purported educational concerns bear an extremely hollowsounding ring.

As to the first concern, the record in this case shows that children were frequently, perhaps in most cases of overcrowding, bussed for a period of a year, and bussing for more than a year was common. As to the second concern, the record shows that the defendants had never before hesitated to bus primary school children, even kindergarten children, if overcrowding conditions or school renovation necessitated it. As to the third concern, as indicated in section III–C of this decision, the "neighborhood" school policy was simply too flexible a policy and was never so rigorously applied as to serve as a basis for overcoming the inference of discriminatory intent that arises from the committee's action with respect to this proposal. Finally, as to the fourth concern, the defendants' objective of eventually eliminating bussing would not have been hindered under the terms of the proposal, for the proposal did not call for any new bussing—it called only for mixing those students who were being bussed anyway due to overcrowding or renovation of schools. The Court therefore rejects the defendants' proffered rationalizations for the committee's rejection of the mixed bussing proposal.

F–56. Defendants contend that they used intact bussing because they claim it had certain advantages over mixed bussing: (1) It could be accomplished flexibly during irregular time periods not amounting to one full semester or one full year. (2) It was economical because bussing expenditures would be made only for the actual period that bussing was necessary. (3) It was efficient because the records in administrative control could be maintained at the "neighborhood" school with no need to reshuffle records at the receiving school, making the records less accessible to parents of the bussed students. (4) It was deemed to have educational advantages because it avoided the necessity of reorganizing classes in the middle of a semester's program, thereby obviating the destruction of the continuity of a semester's educational program which the changing of teachers would involve. (5) By staying with their "neighborhood" school teacher and utilizing the "neighborhood" schools, instructional materials, and equipment at the receiving school, pupils remained in constant and direct contact with a teacher familiar with and experienced in meeting their individual educational abilities and needs. (6) Intact bussing was the least disruptive method of transportation because (a) if busses were late, only the transported classes would be affected, and (b) early departures to assure the presence of crossing guards at traffic intersections did not disturb the receiving school students. (7) Special help can be provided more easily under the intact method.

F–57. The claimed advantages of intact bussing over mixed bussing, however, do not explain its use in connection with all of the bussing from predominantly black schools. For example, the bussing from black schools which were chronically overcrowded during the 1963–71 period was predictable both as to the fact that bussing would be required and that it would last for at least one year. In fact, the intact bussing out of thirteen predominantly black schools (or almost one-half of all schools which were predominantly black by 1971) lasted for from four to sixteen semesters each. Under such circumstances, intact bussing provided no special advantage regarding economy or the need to reorganize classes in the middle of a semester's program, or changing teachers more often than would normally occur. Bussing because of overcrowding generally started at the beginning of the semester. Moreover, before the commencement of bussing large numbers of black students, defendants had to bus students from predominantly white areas of the city where there were more school children than the nearest school facilities could accommodate. In these "overcrowded" circumstances, the claimed advantages of intact bussing did not persuade defendants that intact bussing should be used, and, instead, mixed bussing was the method generally employed. The wisdom of using intact bussing out of chronically overcrowded schools was not unquestioned by principals. At the supplemental hear-

ing, an Assistant Superintendent admitted that in 1967, when he was a principal, he recognized that intact bussing was not a good situation for children and therefore suggested to the Central Administration that if bussing were to last an entire year, mixed bussing be used.

F–58. Educators in the Milwaukee Public School System also admitted that in a multiracial society, it was worthwhile from an educational point of view for children of different races to share educational experiences. A school official who has been Assistant Superintendent since 1956 testified on cross-examination that the welfare of the child rather than administrative convenience should be the criterion for deciding among various educational options. He also admitted that it was "obvious" that intact bussing of black children into a white school was a different kind of experience for the bussed children than was intact bussing of white children to a white school. Thus, school officials were not completely ignorant or unmindful that the intact bussing of black children into white schools was, to paraphrase the testimony of Dr. Gordon Foster, a recognized expert on school desegregation, a demeaning experience, one which Judge Fox recently noted in Berry v. School District of the City of Benton Harbor, 442 F.Supp. 1280, 1307 (W.D.Mich. 1977), "can have severe educational and psychological impact upon Black and White students affected by it." Nevertheless, defendants deliberately chose to expose students to this experience in order to quarantine black students who were bussed into predominantly white schools.

### G. Findings from This Court's Previous Decision

F–59. At 408 F.Supp. at 789, this Court found that bussing for overcrowding and for renovation was always intact. Evidence presented at this second hearing has shown that finding to be in error in that it was only true with bussing for overcrowding and for renovation from black schools. Bussing for overcrowding and for renovation from white schools was not always

intact. For instance, in 1958–59 there was mixed bussing for overcrowding out of the Engleburg School (0–10% black) and the 66th Street School (0–10% black), and in 1959–60 there was mixed bussing for overcrowding out of the Engleburg and Parkview Schools (0–10% black). Moreover, the bussing in 1960–61 from Auer School (0–10% black) to 68th Street School (0–10% black) for renovation was conducted on a mixed basis. The evidence also established that when overcrowding developed in the peripheral areas of the city in the early 1950's, bussing was mixed while new schools or additions to existing schools were being built.

### H. Conclusion

F–60. The defendants' policy of transporting students from black schools on an intact basis reveals that the defendants were acting with intent to discriminate.

## VI. Student Transfers

F–61. Historically, defendants have had two transfer policies under which students could voluntarily transfer from their district schools to other schools in the system. These were the "free transfer policy," which was adopted as early as 1947, and the "open transfer policy," which in 1964 replaced the free transfer policy and continued until after this Court's January 19, 1976, decision. The only substantial difference between the free transfer policy as originally adopted and the open transfer policy was that under the latter, unlike the former, transfer applications did not need to state a reason, and generally no member of the Superintendent's staff made a judgment as to whether the requested transfer would be in the best interest of the student.

F–62. Under the earlier free transfer procedure (1) the reason for the requested transfer had to be stated on the application, (2) the principals of the losing and receiving schools would be contacted and the reasons for the transfer would be discussed, and (3) if both principals approved, if available space existed in the receiving school, and if there were no reasons why the transfer

should not be made, the Superintendent's staff would automatically issue the transfer permit. If either or both principals noted on the transfer application that the transfer should not be allowed, then the final decision as to whether the transfer should be permitted would be made by an assistant superintendent or his designee in the Central Administration. This decision was made after extensive review of the student's situation and often resulted in conferences with the parents and/or the pupil at which the reasons for the transfer were discussed in depth. The controlling consideration was whether there was any reason why the requested transfer should not be granted in terms of the best interests of the student in light of such factors as program adequacy, the distance involved in going from home to school, validity of the stated reasons, and the availability of space in desired classes. Originally, transfer determinations were not to be based upon the race of the student or the student body racial composition of the losing or receiving schools, since race was not considered to be a valid reason for requesting a transfer. The Central Administration later verbally instructed principals to approve free transfer requests regardless of the reason given on the transfer request form where other considerations, such as lack of space, did not preclude the transfer. Applications were to be approved even if the stated reason was racial, and numerous requests for transfers stating racial reasons were approved and granted. This Court finds that the defendants changed their policy so as not to impede white parents from withdrawing their children from predominantly black or racially mixed schools.

F-63. Under the open transfer procedure adopted in 1964 (1) the transfer application would generally be automatically approved by the Central Administration if there was available space in the receiving school, (2) all denials were the result of the lack of available room, and (3) first priority was given to pupils residing in the district who wished to attend their district school. Under both free and open transfer procedures (1) a transfer permit once issued to a student was permanent in the sense that it need not be renewed each year, and (2) transportation was not provided by the system which meant the transferring student or his parents had to bear the costs of transportation. School Board policy and Central Administration practice was to follow a first-come, first-serve basis with priority determined by the time and date stamped on the transfer application when it was filed with the Central Administration. Both the free and open transfer procedures required that prior to May 1 and December 1 of each year (i. e., near the end of the school year and prior to the beginning of the second semester, respectively), the principals of the schools in the system would indicate their projected enrollments for the coming semester. If there was available room in a particular class after school commenced, transfer applications would thereafter be granted to fill the spots available in those classes.

F-64. The magnitude of the incidence of transfers among secondary students is suggested by the following figures: during 1967–68, there were 4,032 applications, of which 3,300 (81.9%) were granted; during 1968–69, there were 4,570 applications, of which 3,727 (81.6%) were granted; during 1971–72, there were 3,861 applications, of which 2,814 (72.9%) were granted; during 1972–73, there were 4,327 applications, of which 3,522 (81.4%) were granted. During this period of time the system's total secondary school enrollment was approximately 45,770. Thus, during each year the number of transfers granted averaged 7.39% of total secondary enrollment. This statistic, however, does not truthfully represent the total impact on the secondary system because of the fact that the transfers granted were permanent in nature; i. e., once granted, they did not have to be reviewed or otherwise renewed in following years. The cumulative transfer effect was thus greater than the foregoing statistics might suggest.

F-65. During the period 1950–68, for example, the evidence established that voluntary transfers were a factor substantially

affecting the percentage of nonwhite students at a number of schools during particular years. In each example below, the statistic for the number of students transferring out includes the students transferring out of the listed junior or senior high school as well as the students who transferred out of the junior or senior high school district prior to having matriculated into the listed junior or senior high school.

(a) During 1961–62 through 1967–68, King High School's enrollment was about 2,028, and its student body racial percentage went from about 10–33% black to 76.54% black. There were generally in excess of 100 white students and approximately 25 to 50 black students transferring out each year. During 1961–62 through 1963–64, there were about 50 black and 140 white students transferring in per year. During 1964–65, there were 64 black and 54 white incoming students; from 1965–66 through 1967–68, the number of students transferring in was insubstantial.

(b) During 1961–62 through 1967–68, North High School had an enrollment of about 1,450, and its student body racial percentage was in the 90–100% black category. Each year it had substantial numbers of both black and white students transferring out, ranging from about 300 students per year (about 150 white and 150 black) to about 175 students (145 black and 30 white) near the end of this period. During the earlier portion of this period, there were substantial numbers of black students transferring in but never substantial numbers of white students. Near the end of this period, the number of students transferring in became insubstantial.

(c) During 1961–62 through 1967–68, Fulton Junior High School had an enrollment of about 1,221, and its student body racial percentage was always in the 90–100% black category. During this period the total number of students transferring out ranged from 100 to 140 pupils per year, with the number of white students ranging from about 50 to 100 per year, and the number of black students rang-

ing from about 50 to 65 per year. During this period the number of students transferring into Fulton Junior High School was never substantial.

(d) During 1961–62 through 1967–68, Roosevelt Junior High School had a total student enrollment of about 931, and its student body racial percentage was always in the 90–100% black category. Each year there were about 150 to 175 black students transferring out and about 15 to 30 white students transferring out. During this period the number of students transferring in was never substantial.

(e) During 1961–62 through 1967–68, Wells Junior High School had student enrollments of about 1,136, with its racial percentage going from about 33–50% black to 57.47% black. During the first three years of this period, there were an insubstantial number of black students transferring out and about 175 white students transferring out each year. During the last four years of this period, there were about 35 black students transferring out and in excess of 200 white students transferring out each year. During the first three years of this period, there were generally in excess of 80 black students and 50 white students transferring in each year. During the last four years, there were generally around 90 black students and about 25 white students transferring in each year.

F–66. This pattern also existed in the elementary schools, and, again, in each example below the statistic for the number of students transferring out includes the students transferring out of the listed elementary school as well as the children who transferred out of the elementary school district prior to having matriculated into the listed elementary school.

(a) During 1957–58 through 1967–68, Berger Elementary School had student enrollments of about 686, with its student body racial percentage going from 1–10% black to 88.24% black. From 1962–63 on, there were generally about 20 black and 30 to 40 white students transferring out

each year. During the first few years of this period, there were about 20 to 25 white students transferring in each year. Other than this, the number of transfers in were insubstantial.

(b) During 1957–58 through 1967–68, 4th Street Elementary School's student body was about 465, with its student body racial percentage being in the 90–100% black category. During 1957–58 through 1967–68, there were an insubstantial number of students transferring out each year. During the same period, a substantial number of black students transferred in each year. The number of white students transferring in was insubstantial.

(c) During 1957–58 through 1967–68, Keefe Elementary School had student enrollments of about 950, with its student body racial category going from 10–33% black in 1957–58 to 98.59% black in 1967–68. Prior to 1961–62, when the school was in the 67–90% category, the number of black students transferring out was insubstantial. At that time, however, there were in excess of 30 white students transferring out each year. During the last six years of this period, there were in excess of 20 black and 10 white students transferring out each year. With respect to incoming transfers, after 1962 there were not substantial numbers of students involved. During 1957–58 through 1959–60, there were generally about 25 to 30 white students transferring in each year. During the next two years, there were generally around 15 black and 20 white students transferring in each year.

F–67. The transfer procedure has not been utilized by a sufficient number of black students transferring to predominantly white schools to eliminate predominantly black schools or to otherwise achieve racial balance in the MPS schools. While the transfer procedure does permit white students to flee from black schools, it has also improved the black student representation at numerous predominantly white schools.

F–68. A study published in 1972 by the defendants concerning the effects of open transfers on the racial makeup of schools reveals that in almost every high school there was an increase in the percentage of black students comprising the student body, which shows that the open transfer policy, while making black schools black, also increased the dispersion of black students into white schools. If one looks to all schools, in some cases there were substantial increases in racial representation through the use of open transfers. The notable example is Wright Junior High School which would have been 0.6% black without open transfers, but which with them was 20.2% black. In this instance Wright was located on a bus line which permitted those black children, whose parents could afford it, to go to this school in the white neighborhood. In quite a few cases, predominantly white schools increased several percentage points in black pupil population due to open transfers. For example, Bartlett went from 0.9% black to 2.2% black, 53rd went from 1.7% black to 9.5% black, Hawley went from 0% black to 1.9% black and Silver Spring went from 15.9% black to 20.3% black.

F–69. However, despite this integrative effect of the open transfer policy, the evidence indicates that the policy did allow whites to transfer out of black or racially mixed schools, which for some schools, which were usually the transitional schools, resulted in a significant increase in the black percentage of the students at the schools and an increasing identifiability of those schools as being black schools. The defendants' above-mentioned 1972 study concluded that the policy "has resulted in a number of whites who were in predominantly black schools going to other schools." The evidence indicates that defendants' transfer policies facilitated the flight of white students from black schools at a point in time preceding a comparable departure of white residents from black neighborhoods.

F–70. In 1963, representatives of the National Association for the Advancement of Colored People requested a modification of the free transfer policy, under which approximately one out of twelve children in

the system were on transfer. The NAACP proposed that in the future racial integration should be added as a criterion for granting student transfers. Moreover, civil rights leaders argued that the effect of the free transfer policy "is to contribute to racial imbalance by permitting whites to flee from certain schools while Negroes are prevented from transferring for purposes of integration."

F–71. By that time, school officials knew that some whites were using the free transfer policy to flee black or racially-changing schools. In July 1963 Theodore Kuemmerlein, then MPS Director of Pupil Personnel, was interviewed by a newspaper reporter who testified at this remand hearing. The reporter wrote:

"He [Kuemmerlein] said that white parents often request transfers for their children because their neighborhood school is changing, becoming predominantly Negro. Racial reasons are sometimes cited directly, he said, but 'parents often cover up,' giving other reasons. 'The stated reason is not generally the real reason,' he said."

This language appeared in a by-line article in the July 31, 1963, issue of the Milwaukee Sentinel. The same reporter also testified that she interviewed the principal of North Division High School, who told her, "Most whites transfer out of the district. * * * We have had a long tradition of free transfers and it would be hard to stop it. They transfer for a lot of reasons. * * * Some even say it's because of the Negroes, but most aren't that frank." The principal's statements appeared in the Milwaukee Sentinel on August 31, 1963. Moreover, numerous free transfer applications approved by the Central Administration contained reasons for transfer indicating a desire not to have to attend school with large numbers of blacks.

L–15. As the Sixth Circuit noted, "A policy which allows transfers from racial minority schools to racial majority schools invites abuse, and where such abuse occurs

and is ignored by school authorities it is tantamount to an authorization for white students to flee and is an obvious means for the perpetuation of segregation." *NAACP v. Lansing Board of Education,* 559 F.2d 1042, 1051 (6th Cir. 1977), cert. denied 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977).

F–72. The defendants never adopted the NAACP proposal of adding racial integration as a reason for granting transfer requests. Instead, the defendants adopted the "open transfer" policy, which dispensed with the free transfer policy's requirements that an educational reason be listed as the ground for the transfer and the requirement that both the losing and gaining school principals approve the transfer request.

F–73. In Milwaukee, the open transfer system has proven to be an open invitation to white students to flee from black schools. *Cf. Berry v. School Dist. of Benton Harbor,* 442 F.Supp. 1280, 1313 (W.D.Mich.1977). This is consistent with the experience in other cities, where various transfer and freedom-of-choice policies have exacerbated racial imbalance. Even if in 1964 Milwaukee school officials were unaware of this national experience, they soon realized that their transfer policy was exacerbating racial imbalance and causing schools in mixed residential areas to become blacker than their surrounding neighborhoods. Despite this, defendants failed to modify their open enrollment policy. In fact, in 1974, the School Board rejected a proposal known as the "balanced open enrollment policy," which would have modified the present open transfer policy by placing restrictions on some transfers that would aggravate racial imbalance.

The defendants have protested that no abuse of their transfer policies has been shown because there is no indication that the policies allowed whites only to transfer. In fact, they correctly argue, their transfer request forms did not even request the transfer applicant to state his race on the form. However, the abuse of the transfer

policies lies not in any discriminatory application of the policies; rather, the abuse is the utilization of the policies to allow white students to escape those schools which they would otherwise have been required to attend with large numbers of black students. That the transfer option was supposedly equally available to blacks and whites alike does not overcome the discrimination that resulted from the defendants' transfer policies, for, as noted in several other portions of this decision, it has never been shown that the defendants wanted to keep all blacks separate from all whites. Their concern was only to keep whites from having to attend school with large numbers of blacks, and the defendants' transfer policies admirably served the purpose of allowing whites to flee schools that already were or that were becoming black. That the defendants affirmatively decided to continue the transfer policies even after the abuse of the policies by white students became widely known indicates that the defendants intended to discriminate against black students by allowing the schools to become increasingly segregated as the result of the transfer policies.

F–74. The Court in *N.A.A.C.P. v. Lansing Board of Education*, 559 F.2d at 1051, concluded that "[w]here the foreseeable and actual result of a transfer policy is to increase the racial identifiability of schools with large minority enrollment, continuation of the policy gives rise to a presumption of segregative intent." Defendants' open transfer policy had this racial effect. That effect was not only foreseeable but was actually known to school officials. This presumption or inference has not been rebutted. The evidence indicates that defendants' refusal to modify the open transfer policy was consistent with their desire not to impede white parents from withdrawing their children from racially-mixed or predominantly black schools.

## VII. Boundary Changes, Site Selection, and School Construction

### A. An Overview of MPS Boundary Changes, Site Selection, and School Construction

F–75. Since 1950, the Milwaukee Public School System has grown rapidly geographically, in total enrollment, and in black enrollment. Geographic expansion occurred as the city annexed outlying areas, nearly doubling the system's territory between 1950 and 1960. Between 1950 and 1972, enrollment rose from approximately 67,000 pupils to approximately 128,000. The growth in the number of black pupils is even more dramatic. This growth has resulted from the quintupling of the city's black population between 1950 and 1970, rising from 22,000 (3½% of the city population) in 1950, to 62,000 (8½%) in 1960, and then to 105,000 (14½%) in 1970. This dramatic growth of the city's black population sprang from the twin impetus of the influx of large numbers of blacks from other areas of the country, particularly the south, and the higher rate of births of blacks.

F–76. Black pupils comprised about 35% of the system's pupil population in the 1975–76 school year. In the 1977–78 school year, the racial makeup of the system's pupil population was 40.3% black and 52.4% white. No specific evidence was presented as to whether the rapid enlargement of the proportion of black pupils in the system between 1975–76 and 1977–78 was due to "white flight" or was due to an increase in the number of black children, but it was probably due to both.

F–77. This growth resulted in overcrowding in many areas of the city and especially in those school districts where white populations were replaced by black populations containing relatively more school-age children. In 1975–76, the last school year before the implementation of the Court's previous desegregation remedy, the system's schools had the following black pupil populations:

NUMBERS OF SCHOOLS IN VARIOUS RANGES OF BLACK PUPIL PER-
CENTAGES IN 1975–76 SCHOOL YEAR

|  | 0–10% | 10–33% | 33–67% | 67–90% | 90–100% |
|---|---|---|---|---|---|
| Elementary Schools | 59 | 26 | 10 | 4 | 23 |
| Jr. High Schools | 7 | 4 | 3 | — | 5 |
| Sr. High Schools | 7 | 2 | 2 | 2 | 2 |

There were also six separate special schools in the system which had the following black student percentages: 36%, 45%, 14%, 25%, 49%, and 4%. However, many of the schools covered by the above table were either less than 15% black or close to 70% black. Applying the ranges devised for implementing the Court's earlier desegregation order, the Court finds that in 1975 there were 20, or 12%, of the system's schools in the 25–50% black range; 32, or 19%, of the system's schools in the 20–60% black range; and 45, or 27% of the system's schools in the 15–70% black range. These percentages show a substantial degree of racial imbalance in the pupil population of the MPS schools.

F–78. The steps the defendants took to deal with overcrowding in these districts, individually and in conjunction with each other, had the effect of increasing racial imbalance. These steps included the building and siting of new schools, building additions to existing schools, leasing or purchasing unused buildings for school purposes, utilizing substandard classrooms, changing district boundaries, and the intact bussing of black students to majority white schools.

F–79. The impact of each of these steps to relieve overcrowding, other than intact bussing, was as follows:

(a) Of the sixty-three boundary changes made from 1950–1968 in those schools which were majority black by the 1968–69 school year, twenty-nine increased the concentration of black students in ghetto schools. In one case it resulted in a number of black students attending a white school for the first time. Twenty-eight changes had no effect because there were no differences in the racial make-up of the losing school and the gaining school. In five cases the results were inconclusive as the boundary changes affected schools that differed in their racial make-up, although five of the schools involved were majority black. Moreover, in twenty-two of these sixty-three boundary changes, the percentage of black residents in the group of blocks transferred was lower than the percentage of black pupils in the "losing" school from which they were transferred. In each case, they were transferred to "gaining" schools that also had fewer blacks than the losing school. In other words, comparatively white blocks were in these twenty-two instances shifted from black schools to white schools, or at least to schools with fewer blacks. In eight other instances, the percentage of black residents in the group of blocks transferred was higher than the percentage of black pupils in the losing school; in seven of these cases the gaining school had a lower percentage of whites. In sum, blocks with racial characteristics different from the losing school were shifted to schools with racial characteristics more like those of the transferred blocks.

The defendants argue that this analysis overlooks the potentially integrative effects of their boundary changes by not considering the effect upon both the school gaining blocks and the school losing blocks as the result of a change. This argument fails because on balance the integrative effect on those white schools that received new blocks that had a few blacks in them was incidental when compared with the number of white children that were transferred out of black schools by such boundary changes. One cannot validly assert, as the defendants have, that every boundary change has equally both an integrative and a segregative

impact. One must examine the racial percentages of blocks transferred to determine the racial result of boundary changes, which on balance did have segregative effects.

(b) Defendants' consistent response to overcrowding in school districts with increasing black populations was to compress boundaries. This was often accompanied by an expansion of facility capacity through such techniques as the building of additions and the utilization of substandard classrooms. Additions were sometimes built with excess space. This pattern of boundary compression and facility expansion had the inevitable effect of confining and containing the disproportionately large growth in black pupil population within the borders of the newly black neighborhoods and kept the black pupil population from spreading to the rest of the city. This increased the concentration of black pupils in central city schools and exacerbated the degree of racial imbalance in the city as a whole. Moreover, the disproportionate use of substandard classrooms in black schools resulted in concentrating black students at times when the use of facilities at nearby white schools would have resulted in an appreciable degree of face mixture at these white schools. The effect in many instances of this pattern of boundary compression and facilities expansion was that schools in contiguous districts would be predominantly of one race or another.

This finding is supported by the testimony of Dr. Harold M. Rose, an expert witness called by the plaintiffs. The defendants have argued that there simply was no available space in white schools located near to black schools that could have been used to house students from the overcrowded black schools. Yet, Exhibit 6061, a study prepared from the defendants' memorandum on intact bussing, Exhibit 5635, shows that there were many white schools located near to the black core area that were in fact used to house students bussed in on an intact basis from other schools. To cite a few examples, Green Bay School (10–30% black) had five available classrooms in each semester of 1962–63, eight available classrooms in the first semester of 1963–64, four available classrooms in the second semester of 1963–64, and at least two available classrooms in each semester of 1964–65; Fratney School (0% black) had two available classrooms in each semester of 1964–65; North 38th Street School (0% black) had three available classrooms in each semester of 1962–63 and two available classrooms in each semester of 1963–64; and 37th Street School (0–10% black) had two available classrooms in the second semester of 1964–65.

(c) New schools were generally built in the peripheral, predominantly white areas of the city. However, since 1950 defendants constructed two new junior high schools, Fulton and Parkman, and two new elementary schools, Holmes and MacDowell, in the inner city. Fulton opened in the second semester of the 1960–61 school year as a 67–90% black school, and by the next year was 90–100% black. Parkman opened in the 1968–69 term as a 93.63% black school. When Holmes opened in the 1966–67 school year, its student body was 85.05% black. MacDowell opened in the second semester 1966–67 with a 44.77% black student body. Since 1950, defendants also converted several existing structures to school use. Walnut, which previously had been closed, was re-opened in 1951–52 as a 0–10% black elementary school. Garfield, which previously had been a city-wide specialty junior high school for girls, was converted to elementary school use in 1952–53, and in that year operated as a 90–100% black school. In the 1966–67 school year, defendants leased a vacant parochial school building, named Meinecke School by defendants, which opened as a 99.26% black elementary school. Finally, since 1950, defendants used existing buildings as annexes for overcrowded black schools. The former 8th Street School building was re-opened to house children bussed from Fulton Junior High, a virtually all-black school.

Defendants also formed Jackie Robinson School by re-opening the 68th Street School building and by leasing a vacant parochial school building adjacent to it. Although Jackie Robinson was located in an all-white neighborhood, it opened as a black school because it only housed students bussed across town from Fulton and from Peckham, a virtually all-black junior high school several miles to the northeast. Defendants also acquired the use of a former business college to house some students from Franklin School, and they used another vacant parochial school building as an annex for Clarke Street School. Both of these opened with predominantly black student bodies. These actions increased racial imbalance.

F–80. The racial impact of these actions was foreseeable and was made with the knowledge of their racial effect. Defendants possessed general knowledge as to the racial characteristics of neighborhoods affected by their decisions. Moreover, the Central Administration and its Department of School Housing Research, later known as the Department of Facilities Planning and Administrative Research, gathered pertinent population and student data in order to plan for the long-term housing needs of the system's pupils. Defendants' planning personnel utilized, among other information, data contained in United States census reports, information concerning real estate development, birth statistics, student enrollment data, and data concerning the planning and development of parks, playgrounds, expressways, and off-street parking lots. Among the census data considered was that relating to the age-distribution of persons residing in certain census tracts. This data was utilized to predict future numbers of school-age children in residential areas served by the system's schools. The data indicated that black residents tended to have a disproportionately large number of pre-school and school-age children and that relatively more black residents were of child-rearing age. Recognition of these markedly different census data patterns of black and white residents enable the Central Administration to under-stand one of the primary causes of the increased enrollment in those schools serving black residential areas and to ascertain the racial effects of actions affecting pupil populations at schools, such as boundary changes.

The defendants have argued that only with precise, detailed, block-by-block data could they have gerrymandered school districts and kept track of the growth and the location of Milwaukee's black population. The Court is persuaded that through the above-mentioned sources and their awareness of the area of the city that was known to be the black area, the defendants did, in fact, have a good deal of detailed racial information. One example is Exhibit 453, also listed as page 58d to Exhibit 404. Exhibit 453 is a detailed chart prepared sometime during the 1960's by a former MPS Director of School Housing Research showing the percentage of white and black residents in various age categories for the Hopkins Street School district. This exhibit is apparently one of many such charts prepared by the defendants for use in their planning for the school system. Moreover, to achieve their goal of preventing white students from attending schools with large numbers of black students, the defendants did not need to have exact block-by-block breakdowns of racial percentages. The information that was available to the defendants was sufficient for their purposes. Furthermore, the defendants' pattern of racial imbalance in their schools would be impossible to explain if the defendants did not have and use information of the races of students in each district and school.

F–81. In addition to using United States census data, the Central Administration conducted its own "school census" each year, at least since 1955. The school census revealed the address and age of each pre-school age child in the city and the address, age, and school attended by each school-age child. The Department of School Housing Research would plot this information by blocks on "spot resident maps" in order to study possible boundary changes. In connection with redistricting, the department

would also consult with principals from the schools affected and have them provide information as to the addresses and grade of each student in the school. This information was then plotted, again by blocks, on a separate spot resident map for each grade level. The number of dwellings on each block was also available to the department. Moreover, the Central Administration personnel involved in redistricting and construction decisions would visit schools on an on-going basis. Thus, although the spot resident maps did not expressly contain racial information, they did reveal the relative density of students per block in the districts affected by boundary changes, and this density information, in conjunction with school authorities' general knowledge concerning the black population and in particular their information that blacks had relatively more pre-school and school-age children, would provide valuable clues as to whether a given block had a higher or lower percentage of black children than the districts involved in potential boundary changes.

L–16. The fact that the segregative impact of defendants' decisions concerning boundary changes, site selection, and school construction was, at a minimum, foreseeable gives rise to the presumption or inference that defendants took these actions for segregative purposes. To rebut this presumption, defendants must prove that their actions were a consistent and resolute application of racially neutral policies. The defendants have not met their burden.

L–17. That some former members of the Milwaukee Board of School Directors who were classified as proponents of greater integration also voted in favor of some of the defendants' actions on boundary changes, site selection, and school construction does not suffice to overcome the inference of discriminatory intent that arises from the objective evidence of the results of the defendants' actions. Just as "[a] law conscripting clerics should not be invalidated because an atheist voted for it," *Washington v. Davis,* 426 U.S. 229, 253, 96 S.Ct. 2040, 2054, 48 L.Ed.2d 597 (1975) (Stevens, J., concurring), an action segregating blacks should not be upheld because a pro-integrationist voted for it.

F–82. At approximately the same time defendants were making decisions concerning site selection, school construction, and boundary changes, they were deliberately segregating students through their intact bussing and student transfer practices. All of these decisions affect where and with whom students were to be educated, and almost all of them allowed white students to avoid being required to attend classes with large numbers of black children. In view of defendants' intentionally segregative conduct in connection with bussing and transfers, this Court is persuaded that the other actions contemporaneously taken by defendants and having a similar effect were also prompted by segregative intent.

B. *Specific Examples of Discrimination in MPS Boundary Changes, Site Selection, and School Construction*

F–83. The conclusion that defendants have not rebutted the presumption does not rest solely on defendants' history of other purposefully segregative acts. The misallocation of available school space demonstrates that the student housing practices of the defendants were not racially neutral. For example, when Center Street School was an all-white school, it was underutilized. Nevertheless, defendants did not use it to give relief to overcrowded black schools immediately to the south. Then, several years later, after Center had become predominantly black and was overcrowded, Pierce School, predominantly white, underutilized and bordering on the east, was not used to relieve Center's overload. Walnut and 27th Street Schools provide a similar example. When Walnut was overcrowded, was using substandard classrooms, and was predominantly black, its neighbor, virtually all-white 27th Street School, had nine unused classrooms. Moreover, most of the Walnut district was closer to 27th Street School than were many blocks in the portion of the 27th Street

district. Other similar instances are in the record.

■ This finding is based upon a study performed by Dr. Robert Stuckert. The defendants have vigorously contested the validity of Dr. Stuckert's analysis of numbers of available classrooms in the above-mentioned schools and of Dr. Stuckert's conclusion that the black schools near to Center, Pierce, and 27th Street School were overcrowded at times when Center, Pierce, and 27th were white and had available classroom space. The Court believes that Dr. Stuckert's study is sufficiently reliable to be given weight. While Dr. Stuckert may not have considered how seriously deficient the substandard classrooms being used in the black schools were, the fact that substandard classrooms were being used at all while standard classrooms in nearby white schools were vacant gives rise to an inference of discriminatory intent.

F–84. The relief for overcrowding provided by defendants to certain black schools indicates that defendants' practices for dealing with overcrowding were not consistently applied and were not, as the defendants claim, color-blind. Defendants' self-chosen priorities for providing relief for overcrowding were as follows: If an increase in enrollment was causing or was expected to cause overcrowding of a particular school, a determination was made as to whether the overcrowding portended to be short or long term. (a) If deemed temporary, the first priority was to find space in the overcrowded school that could be utilized for classroom purposes, such as basement, classroom, auditoriums, and gyms. The second priority would be to find nearby adjacent schools which had vacant classrooms that could handle the pupil overload by means of logical redistricting convenient to the pupils involved or by grade reorganizations, i. e., removing an entire grade level of students from one school and reassigning the students in the removed grade level to another school. Only when the first two priorities were not possible would bussing, the last priority and supposedly defendants' least preferred means for dealing with overcrowding, be used. (b) If the overcrowding was deemed long-term, the first consideration was to be whether an addition could be made to an existing building or whether existing but unutilized facilities could be brought into service through devices such as renting private school buildings. If additions were not practicable, a site for a new school would be selected in a geographic location serving a residential area having a sufficient long-term student population to justify a school building. Bussing was to be kept to a minimum wherever practicable.

F–85. Notwithstanding these self-proclaimed priorities, defendants used intact bussing out of predominantly black schools when a more preferred method of relief was possible which would have involved reassigning students from an overcrowded black school to whiter schools. Examples of this are:

(a) Starting in the first semester of the 1963–64 school year and continuing until the 1971–72 school year, Keefe School intact bussed students because of overcrowding. In the 1963–64 school year Green Bay School, which bordered Keefe, had eight vacant classrooms. In fact, some of these vacant rooms were being used to house Keefe students who were intact bussed into Green Bay. A color-blind planner, following defendants' avowed priorities, would not have intact bussed students from Keefe into Green Bay. Instead, he would have redistricted some blocks from Keefe into Green Bay. This would not have resulted in students walking an unreasonable distance to school since many blocks in the Keefe district were about as close to Green Bay as they were to Keefe. This, however, was not done. In the 1963–64 school year, Keefe was 94.12% black and Green Bay was 28.57% black.

(b) Other opportunities to eliminate intact bussing out of Keefe existed. In the 1965–66 school year, Keefe was continuing to intact bus students for overcrowding, as it did for each semester from 1963 to 1971. During the 1965–66 school year,

Garden Homes, immediately to the northwest of Keefe, had seven rooms that were not being used by its pupils. These rooms instead were being used to house intact bussed students from overcrowded schools. A school official had written a memorandum in the 1964–65 school year indicating that multiple redistricting involving Keefe, Garden Homes, and Phillip Schools was a possible solution to Keefe's overcrowding and that Keefe's principal had suggested redistricting. The same memorandum noted that the enrollment of another school was "increasing and changing rapidly in racial proportion." Again, a color-blind planner following defendants' priorities would be expected to have redistricted Keefe in order to eliminate intact bussing out of it. Instead, Keefe remained overcrowded and it continued to intact bus students. In the 1964–65 school year, when the decision was made to continue the Keefe bussing, Keefe was 96.84% black, Garden Homes was 9.88% black and Phillip was 43.14% black.

With regard to both the Keefe-Green Bay and Keefe-Garden Homes situations, the defendants have argued that they did not make the integrative boundary changes because they foresaw that the relief that would be thereby afforded to overcrowded Keefe would be only temporary. They argue that within a few years, Green Bay and Garden Homes had only two classrooms each that were available to receive students from other districts. Nevertheless, these two examples still show discriminatory intent, for redistrictings between Keefe and Green Bay and between Keefe and Garden Homes would at least have provided relief for overcrowded black Keefe for a number of years until Green Bay and Garden Homes ultimately approached capacity enrollment and perhaps even after the enrollment from the original Green Bay and Garden Homes districts peaked.

(c) In 1960, according to defendants' expert witness, Washington High School and a junior high school feeding it, Peckham, were both overcrowded. Auer School was an elementary school which fed both Peckham and Washington. According to the same witness, North Division School could have housed more students at this time. Auer was approximately the same distance to North, which in 1960–61 housed both junior and senior high school students, as it was to Peckham. Auer was closer to North than to Washington. A planner who was oblivious to race could be expected to change the Auer feeder pattern so high school students from the district attended North. This was not done. In 1960, Auer was 1.7% black, Peckham was 2% black, and Washington was 0% black. North then was 95.18% black.

(d) Berger School was overcrowded from the 1965–66 school year until this Court's January 19, 1976, decision. Bussing was used to relieve this overcrowding, and this bussing was on an intact basis until the end of intact bussing in 1971–72. At one point, over 1,200 students were assigned to Berger, even though the school building was designed to accommodate about 700 students. In 1965–66, Berger, then a 77.87% black school, had a small playground and building an addition to it would have removed even more playground space. Berger's neighbor to the east was Fratney, a K–8 and 3% black school which was not bussing and which then had more playground space than Berger did. The defendants did not even consider building an addition onto Fratney to house some of the Berger district pupils although they gave serious consideration to building an addition onto Berger despite Berger's already extremely overcrowded condition and lack of available space to accommodate an addition without further reducing the already small playground area. Also, instead of either reorganizing the seventh and eighth grades from Fratney and reassigning them to a junior high school, as had been defendants' policy since the 1920's, so as to house some of the Berger district pupils, defendants continued intact bussing out of Berger. Reorganizing Fratney or building an addition to it would have permitted some of the Berger district to be transferred to Fratney. This would not have resulted in stu-

dents in the redistricted territory walking farther to school than defendants' neighborhood school policy allowed.

The claim has been made by the defendants that the alternatives to intact bussing for accommodating the Berger overcrowding were explored but rejected for valid non-racial reasons. The defendants argue that an addition to Fratney and the transfer of Berger district blocks onto Fratney were not accomplished because Fratney was too old a school for an addition to be justified. Yet, the defendants have not explained why they gave serious consideration instead to building an addition onto black Berger despite Berger's equally old age and despite Berger's smaller playground area, while they did not even consider putting an addition onto Fratney according to the testimony of William Seiser, MPS Director of Facilities Planning and Administrative Research. Moreover, the defendants argue that William Seiser's negative answer to the direct question of whether or not an addition was not made to Fratney because of the different racial compositions of the two schools shows a lack of any discriminatory intent. The Court gives this testimony of Mr. Seiser little weight.

(e) Dr. Robert Stuckert pointed out two other examples of defendants' deviation from their own priorities, the first example involving Elm, Brown, Walnut, 31st, and 27th Street Schools in 1958–59 and 1966–67, and the second example involving Auer, Clarke, 21st, and 20th Street Schools in 1960–61. In each example there were overcrowded black schools located near to white schools. Without first considering the racial makeups of the schools involved in each example, Stuckert redrew the district boundary lines and reorganized the grade structures of some schools so as to transfer blocks from the overcrowded schools to the less full schools within each example. By redrawing the boundary lines and reorganizing grades Stuckert found that he was able to eliminate the overcrowding in each example without there being a need for bussing. He also found, after considering the racial composition of the blocks, transferred from district to district in each ex-

ample, that his proposed redistrictings would have resulted in increased integration in some of the schools involved. Yet, for the schools involved in both examples, the defendants ignored redistricting possibilities and failed to convert black K–8 schools to K–6 schools, as had been their policy since the 1920's, and instead resorted to less preferred solutions to overcrowding which contained black pupils in black schools. Dr. Stuckert's proposed boundary changes and grade reorganizations, which followed the defendants' purported priorities and did not require students to walk more than one-half mile to school, did have a mixed racial impact with regard to some schools. This, however, is what would be expected if a planner were not concerned with race.

With regard to the 1958–59 change proposed for the schools involved in the first example, the defendants have argued that no boundary change or redistricting was adopted because those schools were not overcrowded at that time and the defendants could not have foreseen that the schools would become overcrowded in 1962–63. This argument sounds extremely disingenuous in light of the defendants' precisely opposite argument mentioned in subsection (a) above with regard to the Keefe-Green Bay and Keefe-Garden Homes situations wherein the defendants argued that they did not redistrict Keefe, Green Bay, and Garden Homes because they foresaw that Green Bay and Garden Homes would have only a few vacant classrooms within a few years. The defendants did have sufficient information in the 1958–59 school year regarding the numbers of pre-school age children and the increasing blackness of the school districts to know that the districts would soon be overcrowded. Moreover, the schools in the first example were in fact experiencing some overcrowding in 1966–67, for which year Dr. Stuckert also suggested a possible redistricting of the school districts. Thus the defendants' failure to follow their established priorities by altering the school districts in the two examples as suggested by Dr. Stuckert gives rise to

an inference of discriminatory intent to further confine black students to black schools.

F–86. A further alleged example of discrimination has been cited by the plaintiffs in the defendants' aborted plan to have a new Pierce School built in 1957 to replace the schools in the old Center and Pierce districts. In 1947, when Center and Pierce were both white schools, defendants planned to replace the schools in these two adjoining districts with a single building. At that time, the old Pierce building had twelve classrooms, and the Center building had twenty-one standard classrooms. Instead of building a single replacement for the two schools, they built a new school to replace Pierce and continued to use Center until another new school, Holmes, could be built to replace it. In the 1957–58 school year, the new Pierce building opened with twenty-one classrooms and a 0–10% black student body. Center, which was directly west of the Pierce district, was then a 10–33% black school. Garfield and Palmer Schools, which were to the south of the Center district, were respectively 90–100% black and 50–67% black schools. Directly to the west of the Center district was 5th Street School, then a 67–90% black school. Shortly after the new Pierce School opened, twelve white blocks making up one-third of the Center district were ceded to Pierce. From 1960 through 1962, Center operated substantially under capacity, with nine or ten of its classrooms used to house children intact bussed there. In 1966, Center was replaced by Holmes School, which opened as an 85.05% black school with thirty-nine standard classrooms.

Based on these facts the plaintiffs argued that the plan to replace Center and Pierce with a single school was scuttled by the defendants when it became apparent that Center was going to become a black district. Instead of building the one school for the two districts, the plaintiffs claim that the defendants allowed two racially segregated districts to develop side by side when Pierce and later Holmes opened with enrollments of predominantly one race or the other. The evidence, however, does not support the plaintiffs' allegation that the cancellation

of the plan to combine the Center and Pierce districts was racially motivated. The record indicates that the decision not to combine the Center and Pierce districts was made only because the student population of the two districts had grown beyond expectations during the period 1953 through 1957, when new Pierce opened, and could not be housed in the single new building as had been planned. Because the planned construction of the new Pierce School was already well under way when it became apparent that the new school would simply be too small, the defendants could not alter their plans to build a larger school to accommodate the combined districts. After the opening of new Pierce, the white blocks from Center were ceded to Pierce because those blocks were needed to fill the school and they simply were the Center blocks located closest to Pierce. Due to the unexpected pupil population boom, the defendants had little choice but to keep Center open after Pierce was completed. Moreover, the plaintiffs have failed to indicate how it became apparent to the defendants while Pierce was being planned that Center was soon going to become an all-black district, which is what they allege prompted the cancellation of the combining of the Pierce and Center districts. Dr. Stuckert's testimony shows that Center was a 0–10% black district prior to 1957 while the planning for the construction of the new Pierce School was being done. Therefore, no inference of discriminatory intent arises from the defendants' handling of the Pierce-Center situation.

F–87. The districting recommended for the proposed Elm Junior High School illustrates how school districting can be manipulated. The Elm site is located between Lloyd and Brown Streets and 25th and 27th Streets. In 1968, defendants assigned the Brown, Walnut, Elm, 20th Street, and 21st Street elementary school district to the proposed Elm Junior High School district. Most of the 20th Street district was more than three-quarters of a mile from the junior high site, and part of the 20th district was more than 1½ miles from the site. All

of the 21st Street district was at least a mile from the site, and the farthest portion of the 21st district was more than 2¼ miles from the site. Part of the Brown district was more than three-quarters of a mile from the site. On the other hand, almost all of the 31st Street elementary school district was less than three-quarters of a mile from the site. In fact, the 31st Street district came as close as one block to the site. Students from 31st Street School fed into Steuben Junior High, which was 1¼ miles from 31st Street School. However, 27th Street and 31st Street Schools were not included in the proposed feeder pattern. In 1968, 21st Street School was 98% black; 20th Street was 99% black; Elm Elementary School was 51% black; Brown was 95% black; and Walnut was 80% black. In the same year 31st Street was 5% black and its junior high school, Steuben, was 2.38% black. Two board members charged that this districting was intentionally segregative. Defendants never rescinded their decision to acquire the site, but plans for the school's construction were discontinued in 1973. Although the defendants never constructed the proposed Elm School, the defendants' planning of a black feeder pattern into that school and their insistence upon the retention of that plan even in the face of opposition indicate that the defendants were motivated by an intent to discriminate against blacks.

### C. Conclusion

F–88. Based upon the findings detailed in this section, the Court finds that the defendants acted with a discriminatory intent in their decisions and actions respecting boundary changes, site selection, and school construction.

### VIII. Conclusion

F–89. The objective evidence previously described in detail demonstrates that defendants' decisions, at least since 1950, with respect to teacher assignment and transfers, student bussing, student transfers, school siting, leasing and constructing of school facilities, use of substandard classrooms, and boundary changes were undertaken with an intent to segregate students and teachers by race. In making these decisions, defendants did not believe they were shortchanging black students. Defendants, however, viewed racially-mixed schools as problem schools, likely to be plagued by racial incidents, poor teacher morale, and declining academic standards. Moreover, the prevailing belief of the School Board was that any large influx of blacks into white schools would lower the quality of education available to white students there and would eventually cause the white students to leave those schools. Accordingly, defendants undertook a systematic program designed to prevent whites from being required to attend classes with large numbers of blacks.

F–90. A corollary to defendants' belief that the influx of a large number of black students into a white school would lower the quality of education in that school is their fallacious assumption that educationally undesirable characteristics are common to all black children. Defendants, however, did not separate the high achievers from the low achievers, the non-delinquent from the delinquent, the manageable from the unmanageable, the passive from the violent, and the good from the bad. Instead, they deliberately separated most of the whites from most of the blacks, and this the Constitution forbids.

NOW, THEREFORE, IT IS ORDERED that this decision shall constitute findings of fact and conclusions of law made pursuant to the remand of this action from the Seventh Circuit Court of Appeals on the issue of the existence or nonexistence of intent to discriminate or segregate on the part of the defendants.